Joyce R. FUNAI, Plaintiff,

v.

R.L. BROWNLEE, in his capacity
as the Acting Secretary of
the Army, Defendant.

No. CIV.03–00160 ACK/BMK.

United States District Court,
D. Hawai'i.

Nov. 23, 2004.

Clayton C. Ikei, Jerry P.S. Chang, Honolulu, HI, for Joyce R. Funai, plaintiff.

## ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW and DENYING DEFENDANT'S ALTERNATIVE MOTION FOR NEW TRIAL

KAY, District Judge.

On April 7, 2003, Plaintiff Joyce R. Funai sued the United States Army for failing to remedy a work environment hostile to her religion and for suspending and demoting her from her position as a computer operator at Tripler Army Hospital in violation of Title VII of the Civil Rights Act of 1964. On June 14, 2004, the Court denied summary judgment in Defendant's favor on Plaintiff's claims of a hostile work environment based on religion and retaliation.[1] These claims were tried by a jury beginning on August 17, 2004. At the end of Plaintiff's case-in-chief and at the close of evidence, Defendant made Rule 50 motions for judgment as a matter of law, which the Court denied.

On September 1, 2004, the jury found in favor of Defendant on Plaintiff's hostile work environment claim (Count I) but found that Defendant had suspended and demoted Plaintiff in retaliation for her engagement in one or more protected activities (Count II). The jury awarded Plaintiff $110,000 for her emotional pain and suffering. On September 15, 2004, Defendant filed a renewed Rule 50 motion as to the retaliation claim and an alternative motion for a new trial should the Rule 50 motion be denied. Plaintiff filed her Opposition to Defendant's motions on September 28, 2004. Defendant did not file an

---

1. The Court also dismissed Plaintiff's initial claims of race, national origin, and gender discrimination because Plaintiff's alleged harm could have resulted only from the alleged religion-based harassment.

optional reply, which was due by October 11, 2004.[2]

For the reasons set forth below, Defendant's motion for judgment as matter of law and Defendant's alternative motion for a new trial are each DENIED.

# I. MOTION FOR JUDGMENT AS A MATTER OF LAW

## A. Background

The Court will first set forth a summary of the testimony and evidence in order to provide a background of what transpired at trial.

Plaintiff is of Japanese descent and a practicing Shinto. During the time of the relevant events Plaintiff was employed as a civilian, "GS–7" computer operator in the Information Systems Engineering Division ("ISE–C") of Tripler Army Medical Center ("Tripler").

Plaintiff presented witnesses and evidence indicating that starting in October 2000 and continuing until April 2001, Plaintiff's coworker, Laurel Waters, began to regularly harass Plaintiff on the basis of her Shinto religion. Plaintiff contended that her supervisors, Shirley Okamoto, Joel Tanaka, and especially, Dion Cortel, failed to adequately remedy the religious harassment despite her repeated complaints to them about it. Thus, on April 9, 2001, upon the advice of her union representative, Debbie Amaral, Plaintiff obtained a temporary restraining order ("TRO") against Waters. The TRO came on for hearing on April 23, 2001, at which time the parties agreed to mediate and the TRO was dissolved.

On April 24th, 2001, Plaintiff was interviewed by Sgt. Poppert from the Provost Marshall's office regarding her alleged improper use of the Defense Enrollment Eligibility Registration ("DEERS") program on Tripler's computer system to obtain Anthony Waters' social security number (which Plaintiff had mistakenly placed on the TRO petition) and regarding her involvement in the disappearance of a critical computer operations manual and the deletion of the manual's back-up computer files. Plaintiff denied these allegations and at trial contended that she was being retaliated against for complaining of religious harassment and obtaining the TRO against Waters. Thus, Amaral advised Plaintiff to file an EEO complaint of discrimination on the basis of her religion. Plaintiff's supervisors all knew that Plaintiff contacted the EEO office on April 26, 2001. Plaintiff filed a formal EEO complaint of discrimination in July 2001.

In December 2001, Col. Gilbertson, chief of Tripler's Information Management Division and the ultimate decisionmaker regarding adverse employment actions, informed Plaintiff that she would be suspended for 30 days and demoted to "GS–5" due to her alleged misconduct. At trial, Plaintiff argued that she would not have been suspended and demoted but for her engagement in protected activities, specifically repeatedly complaining to supervisors about unremedied religious harassment, obtaining the TRO to stop the alleged religious harassment, and contacting, and eventually filing a complaint with, the EEO office.

Defendant contended that Plaintiff became increasingly annoyed with Waters' work-related incompetence and when her complaints about Waters' incompetence went unanswered, Plaintiff began making false allegations of religious harassment by Waters in order to have Waters fired.

Defendant also presented testimony asserting that Plaintiff had taken the critical operations manual and deleted the manu-

---

**2.** Plaintiff has filed a Motion for Post–Verdict Relief, which Defendant partially opposes.

With this Order, the Court only addresses Defendant's motions.

al's back-up files out of anger at her co-workers for writing a negative letter about Plaintiff, which she accidentally read just before the manual was discovered missing.

Defendant also contended that not only did Plaintiff engage in misconduct warranting the adverse employment actions taken against her, but that the social security number investigation was set into motion by Waters' complaint to Sgt. Poppert of the Provost Marshall's office, who was unaware of Plaintiff's complaints of unremedied religious harassment, and was conducted prior to Plaintiff's EEO contact.

However, Plaintiff contended that Dion Cortel had a retaliatory animus toward Plaintiff, which can be imputed to Col. Gilbertson, the ultimate decisionmaker because of Cortel's involvement in Sgt. Poppert's investigation and Col. Gilbertson's reliance on Sgt. Poppert's report and Cortel's memorandum recommending Plaintiff's removal from employment.

### B. *Applicable Law*

To establish a prima facie case of retaliation under Title VII, Plaintiff must show: [1] she engaged in a protected activity; [2] she suffered an adverse employment action; and [3] a causal link between the protected activity and the adverse employment action. *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir.1997). If a Plaintiff establishes a prima facie case of retaliation, the burden of *production* shifts to Defendant to articulate a legitimate (non-retaliatory) reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If Defendant satisfies this burden, Plaintiff has the ultimate burden of persuasion; Plaintiff must show "*both* that the reason was false, *and* that [retaliation] was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 516–17, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(explaining "that proving the

employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional" [retaliation] ). "It is not enough ... to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 519, 113 S.Ct. 2742. In other words, "plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir.2002)(quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir.2000)). "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial." *Villiarimo, supra.*

### 1. *Pretext v. Mixed–Motive Standard of Proof*

■ In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court articulated the mixed-motive standard of proof. In short, if a Title VII plaintiff can show that an illegal consideration was a "motivating factor" in the adverse employment action taken against her, the burden of persuasion shifts to defendant to show by a preponderance of the evidence that it would have made the "same decision" even if it had not considered the illegal factor. *Id.* at 244–45, 109 S.Ct. 1775. In her concurrence, Justice O'Connor indicated that "the burden on the issue of causation" would only shift to defendant if the "disparate treatment plaintiff [could] show by *direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Id.,* at 276, 109 S.Ct. 1775 (emphasis added). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presump-

tion." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.1998)(alteration in original) (citation omitted).

Two years after *Price Waterhouse* was decided, Congress passed the 1991 Civil Rights Act, which amended Title VII to allow plaintiffs that can show that "discrimination" was a motivating factor in an adverse employment action against them to obtain injunctive relief and recover attorney's fees and costs *even if* defendants are able to show that they would have come to the "same decision" without the illegal consideration. The relevant provisions in the 1991 Act provide:

> On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court-
>
> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
>
> (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42. U.S.C. § 2000e–5(g)(2)(B).

Section 2000e–2 provides, in relevant part:

> (m) *Impermissible consideration of race, color, religion, sex, or national origin in employment practices*
>
> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employ-

ment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m) (emphasis added).

Following Justice O'Connor's concurrence in *Price Waterhouse*, many courts held that plaintiffs would need to present direct evidence of discrimination in order to establish "mixed-motive" liability under Section 2000e–2(m). *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)(citing *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640–41 (8th Cir.2002); *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 580 (1st Cir.1999); *Trotter v. Board of Trustees of Univ. Of Ala.*, 91 F.3d 1449, 1453–54 (11th Cir.1996); *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995)). However, the Ninth Circuit held otherwise. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir.2002). The Supreme Court resolved the conflict by holding that direct evidence of discrimination is *not* required to obtain a mixed-motive instruction under Section 2000e–2(m); plaintiffs need only present sufficient evidence for a jury to conclude by a preponderance of the evidence that race, color, religion, sex, or national origin was a motivating factor for the adverse employment action. *Desert Palace*, 539 U.S. at 101–102, 123 S.Ct. 2148. Retaliation was not explicitly included in the Supreme Court's *Desert Palace* decision.

The Ninth Circuit has clearly contemplated the possibility of mixed-motive retaliation claims. *See Stegall v. Citadel Broadcasting Co.* 350 F.3d 1061, 1067 (9th Cir.2003) ("In mixed motive cases, of which Stegall's case is arguably one, it does not make sense to ask if the employer's stated reason for terminating an employee is a pretext for retaliation, when the employer has offered more than one reason for the action it took").[3] Other circuits who have

---

**3.** *Stegall* does not discuss the role of direct evidence of retaliation in shifting the burden

to defendant-employers to prove rather than simply articulate that it would have come to

ruled on the issue "have unanimously applied the mixed-motive proof scheme to retaliation claims." *Kubicko v. Ogden Logistics Services,* 181 F.3d 544, 553, n. 8 (4th Cir.1999) (citing *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 549–51 (10th Cir.1999); *Thomas v. Nat'l Football League Players Ass'n,* 131 F.3d 198, 202–203 (D.C.Cir.1997); *Tanca v. Nordberg,* 98 F.3d 680, 685 (1st Cir.1996), *cert. denied,* 520 U.S. 1119, 117 S.Ct. 1253, 137 L.Ed.2d 333 (1997); *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039–41 (2d Cir.1993); *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 468 (3d Cir.1993), *overruled on other grounds, Miller v. CIGNA Corp.,* 47 F.3d 586, 596, n. 8 (3d Cir.1995)).

However, as "unanimously" as courts have held that mixed-motive retaliation claims are actionable, they have also held that Section 2000e–2(m) does not apply to retaliation claims and that *Price Waterhouse* continues to provide the relevant standards of proof and persuasion for mixed-motive retaliation claims. *See Kubicko,* 181 F.3d, at 552, n. 7 (citing *McNutt v. Board of Trustees of the Univ. Of Ill.,* 141 F.3d 706, 708–709 (7th Cir.1998); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 932–36 (3d Cir.1997), *cert. denied,* 522 U.S. 914, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997); *Tanca,* 98 F.3d, at 682–685). *See also Behne v. Microtouch Systems, Inc.,* 58 F.Supp.2d 1096 (N.D.Cal.1999) ("In response to *Price Waterhouse,* Congress amended Title VII to permit plaintiffs in mixed motive discrimination cases to obtain injunctive relief and recover attorneys fees and costs. Congress did not provide

for the same relief, however, to plaintiffs in mixed-motive retaliation cases."), *aff'd Behne v. 3M Microtouch Systems, Inc.,* 2001 WL 338087, *2 (9th Cir.Cal.).[4]

Given that *Price Waterhouse* still applies to retaliation claims, in order to obtain the mixed-motive standard of proof under which Defendant will have the burden of persuasion, a plaintiff needs to introduce:

direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.... such a showing requires evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision. The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has reviewed the evidence, which ultimately hinges on the strength of the evidence establishing discrimination. Absent the threshold showing necessary to invoke the mixed-motive proof scheme, however, a plaintiff must prevail under the less advantageous standard of liability applicable in pretext cases in which the plaintiff always shoulders the burden of persuasion.

*Kubicko,* 181 F.3d at 552–53 (quotations omitted).

## 2. *Establishing Engagement In "Protected Activity"*

"A plaintiff's participation in unprotected activity is itself a legitimate, nondis-

---

the "same decision." Nor does *Stegall* address whether retaliation claims qualify for attorney's fees and certain injunctive relief under Section 2000e–2(m) even when defendants have proved they would have reached the "same decision." In fact the *Stegall* court analyzed "Stegall's case as both a pretext case and a mixed motives case." *Stegall,* 350 F.3d, at 1068. Accordingly, *Stegall* is not

instructive beyond affirming the prospect of mixed-motive retaliation, which is not contested in this case nor generally in the case law.

4. The Court is not relying on this unpublished opinion except in accordance with U.S.Ct. Of App. 9th Cir. Rule 36–3, 28 U.S.C.A.

criminatory reason for an employer to take a negative employment action.... The defendant employer is responsible for introducing evidence at trial that a plaintiff's actions were unprotected under § 2000e–3." *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354–55 (9th Cir.1984)(citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Payne v. McLemore's Wholesale*, 654 F.2d 1130, 1143–44 (5th Cir.1981)).

There are two types of "protected activities under Title VII":

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

### a. *"Opposition Clause"*

The "opposition clause" encompasses a wide variety of plaintiff-employee conduct. *See, e.g., EEOC v. Dinuba Medical Clinic*, 222 F.3d 580, 586 (9th Cir.2000)(holding that Plaintiff's filing of a criminal complaint against her supervisor for assault and battery qualified as a protected "opposition" activity because the Court had made underlying factual findings that the assault was the culmination of a series of discriminatory acts by the supervisor against Plaintiff); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir.1983) (concluding that employees' letter to local school district protesting employer's affirmative action award to an allegedly bigoted coworker constituted protected activity under Title VII); *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir.2001)(concluding that employee's police report alleging sexual contact by her employer constituted opposition to sexual harassment and therefore statutorily protected activity). *See also Porta v. Rollins Environmental Services (NJ), Inc.*, 654 F.Supp. 1275, 1284 (D.N.J.1987) *aff'd without opinion*, 845 F.2d 1014 (3rd Cir.1988)(finding genuine issue of fact as to whether plaintiff's refusal to work the same shift as a supervisor who was allegedly harassing plaintiff constituted statutorily protected opposition to unlawful employment practice, thereby precluding summary judgment on retaliation claim).

■ However, to constitute protected activity under the "opposition clause," a Plaintiff's "opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978) ("Even a continuing course of [ ] harassment by a co-employee cannot be imputed to the employer unless the latter both knows of it and fails to take remedial action.") *Id.* at 142.

■ Plaintiffs claiming retaliation must also establish that their opposition was based on a reasonable belief that the challenged employment practice was discriminatory. *See Trent v. Valley Electric Assoc. Inc.*, 41 F.3d 524, 526 (9th Cir.1994) ("a plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII. To establish the first element of a prima facie case, [Plaintiff] must only show that she had a 'reasonable belief' that the employment practice was prohibited under Title VII.") (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 695–96 (9th Cir.1978); *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983))("opposition clause protection will be accorded whenever the opposition is based on a 'reasonable belief' that the employer engaged in an unlawful employment practice.") (quoting *Sias, supra* ).

Although the underlying employment practice opposed by a Plaintiff need not actually be unlawful, evidence of discrimination or an agency's findings of discrimination will support finding that a Plaintiff's belief in discrimination was reasonable. *Crown Zellerbach,* 720 F.2d at 1013, n. 2 ("That the employees' belief that Zellerbach had practiced discrimination was 'reasonable' is sufficiently shown by the fact that the GSA's investigation resulted in findings that Zellerbach practices were 'discriminatory' and 'deficient' in certain respects."). *See also Labonia v. Doran Associates, LLC,* 2004 WL 1921005 *11 (D.Conn. August 25, 2004) (reasoning that "[i]n the absence of any evidence of a[ ] hostile environment, Plaintiff could not have reasonably believed that she was opposing an employment practice" by "filing a police complaint against her coworker") (citations omitted). Evidence of Plaintiff's sincerity, or lack of sincerity, in believing that she is opposing discrimination is also a factor in determining whether her opposition was reasonable and thereby constitutes protected activity. *See Strother v. So. Cal. Permanente Medical Group,* 79 F.3d 859, 869 (9th Cir.1996) ("There is no evidence that Strother's complaints were brought in bad faith or meant to harass the Medical Group. Thus, ... a finder of fact could conclude that she had a 'reasonable' belief that [discrimination] had occurred when she filed her charge ... making her action a protected activity."); *Rucker v. Higher Educ. Aids. Bd.,* 669 F.2d 1179, 1182 (7th Cir.1982) ("it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.").

A Plaintiff's opposition to alleged discriminatory employment practices must also be conducted in a reasonable manner in order to constitute protected activity under the "opposition clause." Thus, Plaintiff must show that her opposition did not disrupt the normal operation of Defen-

dant's business. *See Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346 (9th Cir.1984)("...conduct of a disruptive nature, may exceed statutory protection."); *Silver v. KCA, Inc.,* 586 F.2d 138, 141 (9th Cir.1978) ("[T]he means of opposition must be legal, ... and reasonable in view of the employer's interest in maintaining a harmonious and efficient operation.") (citations omitted); *Reeder–Baker v. Lincoln Nat. Corp.,* 834 F.2d 1373, 1381 (7th Cir. 1987) ("a worker's legitimate beef about race discrimination does not justify failure to conform to (non-discriminatory) standards of conduct. If Reeder–Baker had gone into a funk and refused to work, Lincoln could fire her even though her sour attitude could be traced to discrimination.").

### b. *"Participation Clause"*

■ "It is well settled that the participation clause shields an employee from retaliation regardless of the merit of his EEOC charge." *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir.1978)(citing *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998, 1007 (5th Cir.1969)). Accordingly, the Ninth Circuit has held that "[u]nder the participation clause, ... there can be little doubt that [a Plaintiff's] visit with the EEO counselor constitute[s] participation 'in the machinery set up by Title VII.' As such, it [is] protected activity." *Hashimoto v. Dalton,* 118 F.3d 671, 680 (9th Cir.1997) (quoting *Silver v. KCA, Inc.,* 586 F.2d 138, 141 (9th Cir.1978))(other citations omitted).

Although a "plaintiff's visit with the EEO counselor constitutes participation in the machinery set up by Title VII," the Seventh Circuit has recently determined that in order to constitute "protected activity," such participation must still be "reasonable," just as is required under the "opposition clause." *See Mattson v. Cater-*

*pillar, Inc.,* 359 F.3d 885, 891 (7th Cir.2004)(holding "that the same threshold should apply to both opposition and participation clause cases. Were we to adopt a different standard, an employee could immunize his unreasonable and malicious internal complaints simply by filing a discrimination complaint with a government agency. Similarly, an employee could assure himself unlimited tenure by filing continuous complaints with the government agency if he fears that his employer will discover his duplicitous behavior at the workplace.") (citing *Johnson v. University of Cincinnati,* 215 F.3d 561, 582 (6th Cir. 2000); *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1455 (11th Cir.1998)).

### 3. *Factors Relevant to Causation*

#### a. *Inconsistent Reasons For Adverse Action*

■ Evidence that a defendant-employer provided inconsistent, "legitimate" reasons for an adverse employment action against a plaintiff is probative of pretext and therefore of illegitimate reasons for the adverse action. *Villiarimo,* 281, F.3d at 1063 (citing *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 918 (9th Cir.1996)) (holding that the presence of "shifting" or different justifications for an adverse action is not sufficient to defeat summary judgment when those justifications "are not incompatible.") (other citation omitted). Evidence of a positive performance record in light of a defendant-employer's claims that a plaintiff's poor performance warranted the adverse employment action is also evidence of pretext. *Bainbridge v. Loffredo Gardens, Inc.,* 378 F.3d 756, 761 (8th Cir.2004) (analyzing retaliation under Section 1981).

#### b. *Temporal Proximity*

■ "[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protect-

ed activity.... But timing alone will not show causation in all cases; rather, 'in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression'." *Villiarimo,* 281 F.3d at 1065 (quoting *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1009–10 (7th Cir.2000)) (holding that an 18–month period between engagement in protected activity and an adverse action was too long, by itself, to support an inference of retaliatory causation) (other citations omitted). Of course, defendant-employers must have been aware of plaintiff-employees' engagement in protected activity to establish a causal connection between the two. *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987).

#### c. *"Business Judgment" Evidence*

■ Evidence that a defendant-employer's articulated reasons for an adverse action were "objectively false" or that the employer made a mistake does *not* constitute evidence of prextext. *Villiarimo,* 281 F.3d at 1063. "Rather, courts 'only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless'." *Id.* (quoting *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 733–34 (7th Cir.2001)). *See also, Essex v. United Parcel Serv.,* 111 F.3d 1304, 1310 (7th Cir.1997) ("In examining pretext, the question is whether the employer honestly believed its proffered reason for [the adverse action]. The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual.").

#### d. *Imputing Retaliatory Animus To Decisionmakers*

■ A plaintiff can establish a causal connection by "demonstrat[ing] that the

individual who allegedly retaliated against her was responsible for the decision to terminate her or had significant input in that decision." *McGinnis v. United States Air Force,* 266 F.Supp.2d 748, 774 (S.D.Ohio 2003)(citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185 (6th Cir. 1992)); *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989) (citing *Tafoya v. Adams,* 612 F.Supp. 1097, 1104 (D.Colo. 1985)), *modified on other grounds,* 900 F.2d 27 (4th Cir.1990) (en banc). However, a decisionmaker's knowledge of a conflict between a plaintiff and a coworker with an allegedly discriminatory animus does not alone establish that the decisionmaker had a discriminatory motivation. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir.2003).

When there is no evidence of a decisionmaker's discriminatory animus, a plaintiff can still prove causation by presenting evidence that the decisionmaker simply "rubber stamped" the decision of a subordinate who did have a retaliatory motive. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 288 (4th Cir.2004) (reasoning that there will be no basis for finding discrimination if the decisionmaker made an "independent decision to fire" plaintiff); *Vasquez,* 349 F.3d at 641, n. 9 ("no nexus exists when the decisionmaker makes an independent and legitimate decision to discipline the plaintiff.").

"[E]ven if the ultimate decision-making body is unbiased, there can still be liability imposed if subordinates to that body set in motion a chain of events that lead to the constitutional deprivation." *Ostad v. Oregon Health Sciences Univ.,* 2000 WL 900411, at * 4 (D.Or.2000) (citing *Gilbrook v. City of Westminster,* 177 F.3d 839, 854 (9th Cir.1999)) (holding that jury could have reasonably found causation where "the disciplinary process [ ] *began* with a retaliatory motive, but *ended* with a legitimate one. That is, although the ultimate

decision-maker [ ] had a legitimate motive to impose discipline, the retaliatory motives of two subordinates [ ] set in motion the chain of events that led to [plaintiff's] review and to the adverse employment action.").

### C. *Standard—Motion for Judgment as a Matter of Law*

Motions for judgment as a matter of law are governed by Federal Rules of Civil Procedure, Rule 50, which provides in relevant part:

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment- and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law.

Fed.R.Civ.P. 50(b).

Judgment as a matter of law is authorized "if there is no legally sufficient basis for a reasonable jury to find in favor of [Plaintiff]." *Bell v. Clackamas County,* 341 F.3d 858, 865 (9th Cir.2003) (citing Fed.R.Civ.P. 50(a)). The jury verdict will be affirmed if it is supported by substantial evidence. *Mockler v. Multnomah County,* 140 F.3d 808, 815, n. 8 (9th Cir. 1998). "Substantial evidence is such rele-

vant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999) (internal quotations and citations omitted).

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, in deciding whether judgment as a matter of law is warranted, the Court may not assess the credibility of witnesses and must draw all reasonable inferences in the non-movant's favor (in this case, Plaintiff). *Bell,* 341 F.3d at 865. The Court "may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir.2001). *See also Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 707 (7th Cir.2004) ("Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict.") (citation omitted).

In the context of Title VII cases, "[a]fter a full trial, the only pertinent question is whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation.... It is not ... an occasion for the court to march back through the intermediary burden-shifting steps established by *McDonnell Douglas.* We instead look to the totality of the evidence to determine whether plaintiffs presented sufficient evidence to support the jury's determinations that they were the victims of intentional ... retaliation." *Harvey,* 377 F.3d at 707–708

(citations omitted). *See also Rubinstein v. Administrators of the Tulane Educ. Fund,* 218 F.3d 392, 402 (5th Cir.2000) (" 'When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant.' ... A Title VII plaintiff bears the burden of proving not only that the employer's purported reasons for taking an adverse employment action are pretextual, but also that the employer engaged in illegal discrimination or retaliation.") (citations omitted). Judgment as a matter of law is "inappropriate in cases in which questions of motive predominate in the inquiry about how big a role the protected behavior may have played in invoking an adverse employment decision." *Ostad,* 2000 WL 900411, at *4.

A district court's decision on a motion for judgment as a matter of law is reviewed *de novo. EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997) (citation omitted).

### D. Analysis—Motion for Judgment as a Matter of Law

Defendant's Motion for Judgment as a Matter of Law argues that Plaintiff failed to produce the requisite substantial and specific evidence of Defendant's retaliatory intent because the evidence overwhelmingly shows that Col. Gilbertson had no retaliatory animus toward Plaintiff and made an unbiased decision to suspend and demote her based on Sgt. Poppert's unbiased and independent investigation and reporting of Plaintiff's misconduct. Plaintiff argues that there is sufficient evidence of retaliatory intent because the evidence shows that Cortel had a retaliatory motive against Plaintiff and Cortel assisted Sgt. Poppert in his investigation and recommended to Col. Gilbertson that Plaintiff be terminated, thereby imputing his retaliatory animus to Col. Gilbertson, the ultimate decisionmaker.

### 1. Plaintiff's Burden to Prove "But for" Causation

█ As an initial matter, the Court must clarify which standard of proof applies to Plaintiff's retaliation claim. Plaintiff incorrectly contends that the mixed-motive standard applies and that Defendant had the burden of proving that it did not retaliate against Plaintiff. The Court disagrees for the following reasons.

As discussed, *Price Waterhouse* continues to govern Title VII retaliation claims. Thus, in order to obtain the mixed-motive standard under which the burden is on Defendant to show that it would have come to the same adverse employment decision absent the retaliatory motive, Plaintiff must provide direct evidence of retaliation. Plaintiff cites the following as "direct" evidence of Defendant's retaliatory animus: the coworkers' letter complaining about Plaintiff's disruptive workplace behavior, the letter's authors' testimony indicating that they did not believe the TRO against Waters was warranted, the fact that Plaintiff's first-level supervisor, Okamoto, signed the letter despite having previously given Plaintiff positive work evaluations, the fact that Plaintiff's second and third-level supervisors, Cortel and Tanaka, referenced the letter in counseling Plaintiff about her more recent work performance, and the fact that Cortel and Tanaka recommended Plaintiff's termination to Col. Gilbertson. (Plaintiff's Opposition, at 8–10).

The Court finds that none of the evidence cited by Plaintiff "prove the fact" of retaliation "without inference or presumption." An example of direct evidence in this case would be if Plaintiff produced a statement by Plaintiff's supervisors indicating that they wanted to terminate Plaintiff because she was complaining about her supervisors' failure to remedy religious harassment, or because she filed the TRO, or because she contacted the EEO office (each of which the Court had held were protected activities). Plaintiff's testimony regarding Cortel's threat to fire her and Waters in response to Plaintiff informing Cortel that she planned to obtain a TRO to stop Waters' religious harassment, comes close to direct evidence of retaliatory animus. However, the jury still had to implicitly infer that it was the TRO, and not the many other incidences of bad behavior cited in the coworkers' letter and the other accusations of misconduct against Plaintiff, which Sgt. Poppert had investigated and reported, that motivated Cortel to recommend her termination.

Given that Plaintiff is only able to present circumstantial evidence of Defendant's retaliatory motive, Plaintiff has the burden of proving and persuading the trier of fact that "but for" her engagement in protected activities, she would not have been suspended and demoted.[5]

---

5. Jury Instruction No. 21 correctly described Plaintiff's burden: "The Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence: ... 3. the protected activity was one of the reasons for the adverse employment action and that but for such activity, the Plaintiff would not have been subjected to the adverse employment action."

Plaintiff initially requested a "pure" mixed-motive instruction; while Defendant requested an instruction on "pretext." *See Model Jury Instructions Ninth Circuit, Civil,* August 2004, revision of Chapter 12, at 3–4 ("No *McDonnell Douglas* burden shifting instruction should be given in Title VII cases.... Cases discussing pretext and burden shifting arise in the summary judgment and directed verdict context."). Accordingly, the Ninth Circuit model jury instructions no longer contain an instruction on "pretext." Defendant is not currently arguing for a "pretext" instruction. Both parties ultimately agreed to jury instruction number 21, with the exception that Defendant objected to the inclusion of the TRO as a protected activity.

### 2. Plaintiff's Specific and Substantial Circumstantial Evidence of Defendant's Retaliatory Intent

Plaintiff concedes that Col. Gilbertson had no retaliatory animus toward Plaintiff and instead argues that a retaliatory intent can be imputed to Col. Gilbertson because she has "presented evidence that Plaintiff's supervisors held retaliatory animus against her, and were heavily involved in the circumstances leading to her suspension." (Plaintiff's Opposition, at 11).

For Rule 50 purposes, the Court need only decide whether there was sufficient evidence to support the verdict. The Court finds that the evidence relating to Cortel's involvement in the adverse employment actions taken against Plaintiff sufficiently supports the jury's verdict finding retaliation.

### a. Evidence of Cortel's Retaliatory Animus

Cortel testified that initially he was only told of personality conflicts between Plaintiff and Waters that required a shift-change for one of the women. Cortel indicated that Plaintiff did not complain to him about harassment of any kind by Waters until she learned that Waters would not be laid off, in late March 2001. However, the jury was entitled to believe Plaintiff's and Amaral's testimony that starting as early as October 2000, each reported to Cortel that Waters was harassing Plaintiff on the basis of Plaintiff's religion and that Cortel promised to "take care of it" but then did nothing to address the religious harassment. Cortel stated that he did not believe Plaintiff's allegations of stalking by Waters and therefore did not investigate. Cortel testified that he did "nothing" in response to the February 16, 2001 shouting match between Waters and Plaintiff, for which Waters was reprimanded. Also, when the critical operations manual disappeared, Cortel did not question any of the computer operators who worked during the time the manual was discovered missing whether they had seen or taken it because he assumed Plaintiff caused the disappearance.

Cortel also acknowledged that Amaral contacted him many times about the conflict between Plaintiff and Waters, and Amaral testified that Cortel was "adamant" that the problems between Plaintiff and Waters not go up the chain of command. Accordingly, Tanaka testified that he did not know about the allegations of religious harassment at any time between October 2000 and April 2001.

Plaintiff testified that she told Joel Tanaka that she planned to obtain a TRO and Tanaka advised that Plaintiff consult the Civilian Personnel Advisory Center ("CPAC") and Dion Cortel instead. Tanaka denied speaking with Plaintiff about the TRO before she obtained it, but the jury was entitled to disbelieve him. Plaintiff opted not to contact CPAC because Sharon Amoy advised her that CPAC was essentially corrupt and covered up for management. Plaintiff did however inform Cortel that she was planning to obtain a TRO against Waters. Plaintiff further testified that she informed Cortel about the TRO in the hope that he would respond in such a way that made the TRO unnecessary. Instead Cortel responded by threatening to fire both Plaintiff and Waters. Plaintiff also indicated that when she gave a copy of the TRO to Cortel, he did not examine it and rudely told Plaintiff to leave his office. The evidence showed that Cortel understood that the TRO related to the same complaints Plaintiff had been bringing to him about alleged religious harassment by Waters. Although he denied learning about the TRO from Plaintiff directly, Tanaka admitted learning of the TRO from Cortel and other employees at about the time it was filed. The TRO

and the coworkers' letter certainly brought Plaintiff's allegations "up the chain of command" to Tanaka despite Cortel's apparent desire to keep it quiet.

The printed copies of Boyce's and Tanaka's email messages from April 26 and 27, 2001 show that Okamoto, Cortel, and Tanaka each had notice that Plaintiff had contacted the EEOC. It would be reasonable for the jury to infer that Cortel knew Plaintiff's EEOC contact related to her complaints of religious harassment by Waters. Each of Plaintiff's supervisors were named in Plaintiff's EEOC complaint filed in July 2001. The supervisors presumably received notice that an EEOC complaint had been filed against them.

The jury could reasonably infer from this evidence that Cortel developed a retaliatory animus toward Plaintiff. This evidence suggests that Cortel viewed Plaintiff's complaints of religious harassment as a time-consuming annoyance that he did not believe and did not want to invest time or energy to address. The jury could have reasonably inferred that Plaintiff's filing of the TRO and contact with the EEO office angered Cortel because Plaintiff's activities brought Plaintiff's allegations to the attention of Tanaka, who might reasonably discipline Cortel for failing to resolve or at least address the allegations and keep Tanaka informed of the escalating problems in the computer room. In his memorandum to Col. Gilbertson, Cortel included the missing manual incident as a reason to remove Plaintiff despite that charge having been dropped by Sgt. Poppert, suggesting he was determined to have Plaintiff terminated whether or not it was justified.[6] Finally, Plaintiff named Cortel in her EEOC complaint, which is strong circumstantial evidence of why Cortel might be motivated to terminate Plaintiff's employment.

### b. *Cortel's Involvement in Sgt. Poppert's Investigation*

Although Sgt. Poppert's investigation was initiated upon a complaint by Laurel Waters, Sgt. Poppert involved Cortel in his investigation. Cortel led Sgt. Poppert into the computer room and provided him with the rosters from the white binder from Okamoto's desk that Plaintiff claimed contained a roster with Anthony Waters' social security number. Sgt. Poppert and Cortel testified that Cortel informed Poppert that the rosters had not contained employee social security numbers for many years. However, Sgt. Poppert on his own found that the supervisors' secretaries (who work outside the computer room) all had copies of recent rosters with social security numbers. Although none of these rosters contained *Anthony* Waters' social security number, it would be reasonable for the jury to discredit Cortel's credibility given the fact that rosters with social security numbers did exist at the time when Cortel indicated none had for many years.

When the critical operations manual was discovered missing and computer files were found deleted, Cortel assumed that Plaintiff was involved. Cortel reported the problem and his assumption to Tanaka who asked Sgt. Poppert to investigate. Cortel admitted that he did not ask any of the other computer operators whether they had taken the manual or deleted the

---

6. The Court notes Linda McBane's testimony that the standard for Sgt. Poppert's charges against Plaintiff was much higher than the standard for removal and thus it was not improper for Cortel to cite the missing manual incident even though Sgt. Poppert had determined there was insufficient evidence to formally charge Plaintiff with taking the manual. The jury however, was entitled to infer that given Sgt. Poppert's report, Cortel would not have otherwise included the missing manual incident if he did not have a retaliatory animus toward Plaintiff.

files. Sgt. Poppert testified that his investigation into the missing manual/deleted files was focused only on Plaintiff.

Although Sgt. Poppert learned on his own of rosters that contained social security numbers, the jury might have reasonably inferred that Cortel intentionally tried to frame Plaintiff by telling Poppert that such rosters did not exist. Moreover, Cortel set in motion the investigation into Plaintiff's involvement in the missing manual/deleted files incident, which Cortel admitted he assumed Plaintiff caused and therefore she was Sgt. Poppert's only suspect. The jury could reasonably infer from this evidence that Sgt. Poppert's investigation was not completely unbiased and independent.

### c. *Cortel's Recommendation to Terminate Employment*

On September 17, 2001, after Plaintiff and Amaral had made repeated complaints to Cortel, Plaintiff had filed the TRO, contacted the EEO office, Tanaka had learned of the dispute between Waters and Plaintiff that Cortel had failed to resolve, and after Plaintiff had filed an EEO complaint naming Cortel as a respondent, Cortel submitted a memorandum to Col. Gilbertson recommending that Plaintiff be terminated. In support of his recommendation, Cortel relied in part on his own sworn statement and Sgt. Poppert's investigation, in which he had been involved. Cortel emphasized that Plaintiff was untrustworthy and created an unpleasant atmosphere for her coworkers. Cortel assumed Plaintiff took the manual without questioning other computer operators and went so far as to include the missing manual incident as a basis for termination even though Sgt. Poppert had concluded that there was insufficient evidence to charge Plaintiff with taking the manual. Given that Plaintiff is by all accounts an excellent computer operator, the jury could reasonably infer that Cortel recommended that she be removed

from her employment because he wanted to retaliate against Plaintiff for making time-consuming complaints, for bringing Cortel's inaction to his own supervisor, Tanaka, and for reporting Cortel to the EEOC.

### d. *Col. Gilbertson's Considerations*

On this Rule 50 motion, the Court must decide whether there is sufficient evidence to support the verdict, i.e., whether there is sufficient evidence showing that in deciding to suspend and demote Plaintiff, Col. Gilbertson relied on considerations that were a result of retaliatory motives. The answer is clearly yes. Col. Gilbertson testified that among the various factors he considered in deciding whether and how to discipline Plaintiff was Sgt. Poppert's police report and Cortel's memorandum recommending removal. As discussed, the jury could reasonably infer that Sgt. Poppert's report was based on limited and biased information furnished by Cortel.

It would be quite reasonable for the jury to infer that Col. Gilbertson was highly influenced by the fact that Plaintiff's own supervisor wanted her removed despite her excellent technical skills. Although Col. Gilbertson disciplined Plaintiff with a lesser punishment than that recommended to him, it may be inferred that Col. Gilbertson "rubber stamped" Cortel's memorandum concerning Plaintiff's alleged wrongdoings. In explaining his decision to suspend and demote instead of remove Plaintiff, Col. Gilbertson acknowledged that he did so because he was new to the job (and implicitly had not had the opportunity to fully know all that transpired), he viewed removal as an extremely harsh punishment, and he recognized Plaintiff was a good computer operator who had the potential for rehabilitation. However, Col. Gilbertson accepted as true all of the accusations made against Plaintiff.

## E. *Conclusion—Motion for Judgment as a Matter of Law*

In applying the sufficiency of the evidence standard, the Court finds that Plaintiff has met her burden of proving that Plaintiff was a victim of intentional retaliation. On this record, and without assessing the credibility of witnesses, the Court finds that there was specific and substantial evidence from which the jury could have reasonably inferred that Cortel developed a retaliatory motive due to Plaintiff's repeated, time-consuming complaints, the TRO and Plaintiff's EEO contact, which brought Plaintiff's allegations and Cortel's failure to resolve them to the attention of Tanaka, whom Cortel had hoped would not be alerted, and his subsequent inclusion on Plaintiff's EEO complaint. Plaintiff presented evidence of Cortel's limited investigation into Plaintiff's alleged misconduct, which is the basis of Defendant's articulated legitimate reasons for suspending and demoting Plaintiff and which the jury was entitled to disbelieve. Cortel also included the missing manual incident in his memorandum recommending removal even though Sgt. Poppert had determined there was insufficient evidence to support a charge on that basis against Plaintiff. Col. Gilbertson, the decisionmaker, acknowledged he relied, at least in part, on Cortel's recommendation to remove Plaintiff.

"Questions of motive" clearly "predominate in this inquiry about how big a role" Plaintiff's engagement in protected activities "played in invoking" her suspension and demotion. Here, there is sufficient evidence to infer that Cortel sought to retaliate against Plaintiff and but for Cortel's involvement in Sgt. Poppert's investigation and Cortel's recommendation to Col. Gilbertson, Plaintiff would not have been suspended and demoted. Accordingly, judgment as a matter of law must be DENIED.

## II. MOTION FOR NEW TRIAL

### A. Standard—Motion for New Trial

Motions for new trial are governed by Federal Rules of Civil Procedure, Rule 59, which provides in relevant part:

(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59.

### 1. *Against the Clear/ Great Weight of the Evidence, Seriously Erroneous Result, or Miscarriage of Justice*

The Ninth Circuit has consistently held that a district court's finding that there is substantial evidence to uphold the verdict on a motion for judgment as a matter of law will not necessarily prevent the Court from ordering a new trial. However, Ninth Circuit case law has been less consistent in articulating the circumstances that warrant a new trial, stating variously that district courts have discretion to grant Rule 59 motions when the verdict is "against the clear [or 'great'] weight of the evidence," when the evidence shows that the jury has reached a "seriously erroneous result," and/or when the evidence shows that acceptance of the verdict would cause a "miscarriage of justice." *See EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997) (internal quotations and citations omitted)

(Although the court's ruling on an alternative motion for a new trial involves the exercise of some discretion, a stringent standard applies when the motion is based on insufficiency of the evidence. A motion will be granted on this ground only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result.);

*Roy v. Volkswagen of America,* 896 F.2d 1174, 1176 (9th Cir.1990) ("The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.") (citing *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir.1976) *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977))(internal quotation omitted); *Landes Const. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1371 (9th Cir.1987) ("If there is substantial evidence presented at trial to create an issue for the jury, a trial court may not grant a motion for a directed verdict or for judgment notwithstanding the verdict. The existence of substantial evidence does not, however, prevent the court from granting a motion for a new trial pursuant to Fed.R.Civ.P. 59 if the verdict is against the clear weight of the evidence.").

Although the Court has discretion to assess the evidence within each of these frameworks ("against the clear weight of the evidence," "seriously erroneous result," "miscarriage of justice") the standard for finding insufficient evidence warranting a new trial remains high. *See Roy, supra* (citing *Wilhelm v. Associated Container Transportation (Australia) Ltd.,* 648 F.2d 1197, 1198 (9th Cir.1981)) ("While the trial court may weigh the evidence and credibility of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to a different result from that reached by the jury.' ").[7]

On the one hand, the trial judge does not sit to approve miscarriages of jus-

tice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.... If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

*Landes,* 833 F.2d at 1371–72 (internal quotation and citations omitted) (explaining that "[t]he judge can weigh evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party".).

Although the Court will apply each of the above considerations in deciding Defendant's motion for new trial, for the sake of clarity the Court will hereinafter refer to the "against the clear weight of the evidence" standard, which is most commonly used by the courts.

A district court's decision on a motion for new trial is reviewed for abuse of discretion. *Pape Lift,* 115 F.3d, at 676.

## 2. *Harmful Error in Jury Instructions*

"Jury instructions must be formulated so that they fairly and adequately cover

---

7. Indeed, if this Court had been the fact finder in this trial it would have come to a different result than the jury and would have found in Defendant's favor on both counts. However, after carefully reviewing the evidence and arguments of the parties and having observed

the demeanor of those testifying, the Court finds that the jury's verdict is *not* against the clear weight of the evidence nor that there is a seriously erroneous result nor a miscarriage of justice.

the issues presented, correctly state the law, and are not misleading." *Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir.1999) (quoting *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir.1996)).

An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. While this standard of review is less stringent than review for harmless error in a criminal case, it is more stringent than review for sufficiency of the evidence, in which we view the evidence in the light most favorable to the prevailing party. In reviewing a civil jury instruction for harmless error, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's verdict may have resulted from a misapprehension of law rather than from factual determinations in favor of the prevailing party.

*Swinton v. Potomac Corp.*, 270 F.3d 794, 805 (9th Cir.2001) (citations omitted).

To preserve a claim of error in jury instructions, "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51(c)(1). However, the Court "may consider a plain error in the instructions affecting substantial rights that has not been preserved as required by Rule 51(d)(1)(A) or (B)." Fed.R.Civ.P. 51(d)(2). A district court's formulation of the jury instructions is reviewed for abuse of discretion. However, if the instructions are challenged as misstating the law, they are reviewed *de novo*. *Gilbrook, supra* (citation omitted).

### B. *Analysis—Motion for New Trial*

Having assessed the credibility of witnesses, weighed the evidence, and reas-

sessed jury instruction number 21, the Court finds that a new trial is *not* warranted for the following reasons.

### 1. *The Verdict is Not Against the Clear Weight of the Evidence*

#### a. *Credibility of Witnesses*

■ Both sides presented weak and inconsistent witnesses; some of which is indicated earlier in this Order.[8] The Court, in viewing the demeanor of the witnesses, their testimony, and other evidence, found the testimony of Mr. Cortel especially weak and questionable. It was clear that Cortel did not understand numerous questions posed by either party, had trouble remembering relevant events that supported Defendant, and his answers were often confusing and incomplete. On the other hand, on Plaintiff's side, the testimony of several witnesses was challenged by some tough cross-examination. Yet, the Court finds that the testimony of Plaintiff's witnesses concerning her retaliation claim was in large part credible and supported by other witnesses. Independent of any credibility issues, the testimony was sufficient for the jury to find that Plaintiff's supervisor Cortel knew of claimed religious harassment prior to Plaintiff complaining to his supervisor Tanaka and obtaining the TRO and contacting the EEO office and had reason to retaliate against Plaintiff.

#### b. *Weighing of Evidence Does Not Support a New Trial*

Upon weighing the evidence, the Court does not find that the clear weight of the evidence supports ordering a new trial. The evidence sufficiently established for the jury that Plaintiff's supervisors knew

---

8. The Court notes that in analyzing this motion for new trial, as distinguished from the motion for judgment as a matter of law, that the Court should consider the credibility of witnesses and shall not view the evidence in favor of the non-moving party.

of claimed religious harassment prior to Plaintiff obtaining the TRO and contacting the EEO. The evidence also sufficiently showed that adverse employment actions were taken against Plaintiff shortly after she engaged in these protected activities, notwithstanding that prior to these incidences Plaintiff had been considered the most competent of the computer operators. Finally, there was sufficient evidence for the jury to find that Plaintiff's supervisor Cortel had a retaliatory animus towards Plaintiff based on his frustration at her complaints of religious harassment and her reporting such to a higher level supervisor. Even if the jury believed that Plaintiff's misconduct was a motivating factor in her suspension and demotion, the evidence was sufficient for the jury to find that Plaintiff's protected activities were the "but for" cause of the adverse employment actions taken against her.

The evidence sufficiently showed for the jury that Plaintiff acted reasonably in obtaining the TRO. Plaintiff's own union representative, Debbie Amaral, advised her to obtain a TRO because "management was not doing its job." Plaintiff informed her supervisors prior to obtaining the TRO that she planned to do so. She explained to the jury that she informed her supervisors in advance in the hope that they would provide Plaintiff "some good advice where [she] could avoid a TRO." Plaintiff's supervisors' response did not make the TRO unreasonable: Okamoto indicated she would not stop Plaintiff if Plaintiff felt she needed to obtain a TRO, but Okamoto did not offer to help resolve Plaintiff's allegations; Tanaka indicated he was "sick of this" and advised her to consult Cortel and CPAC (which Sharon Amoy had informed Plaintiff was corrupt and covered up for management); and Cortel threatened to fire Plaintiff upon being informed about her intention to obtain a TRO. Plaintiff also consulted her coworkers regarding their opinion of the TRO in advance of her

obtaining it. Although granted ex parte, Plaintiff's allegations were nevertheless sufficient to obtain the TRO. And, Plaintiff's reasonableness is adequately supported by the evidence showing that she agreed to mediate rather than relentlessly pursue the TRO against Waters. Plaintiff evidently sincerely believed she was being harassed on the basis of her religion based on the comments made by Waters regarding Plaintiff's belief in ghosts and spirits.

The evidence also sufficiently showed for the jury that Plaintiff acted reasonably in contacting the EEO office. Both Amaral and according to Plaintiff, the TRO mediator, advised contacting the EEO if mediation did not resolve Plaintiff's allegations of unremedied religious harassment. Just after the TRO hearing Plaintiff learned she was being investigated for alleged misconduct. Thus, it was reasonable for her to assume that mediation had not resolved her allegations in that management was continuing to disregard her complaints by accusing her of misconduct and therefore contact with the EEO was necessary. Finally, in advance of contacting the EEO office, Plaintiff told Okamoto she planned to do so and there was no evidence presented that Okamoto or any other supervisor attempted to resolve Plaintiff's allegations so as to make her contact with the EEO unnecessary or unreasonable.

There was much conflicting evidence regarding how Plaintiff obtained Anthony Waters' social security number. The jury could have believed that Sanders accidentally placed Anthony Waters' social security number on the roster, perhaps because it was mistakenly given to her by Laurel Waters herself. The jury could have believed Plaintiff's testimony that she had once heard Waters acknowledge that the "wrong" social security number was on the call-back roster and inferred that this was Anthony Waters' social security number.

If so, Plaintiff would not have needed to access the system to obtain Laurel Waters' social security number as she could have obtained it from her friend, Sharon Amoy, a secretary with access to rosters containing social security numbers.

Although Defendant began investigating Plaintiff's alleged misconduct and revoked her access to the computer system before she ever contacted the EEO office, her repeated complaints to supervisors regarding religious harassment and the TRO occurred before any adverse employment actions.

The evidence adequately supported a jury finding that "but for" Cortel's retaliatory animus against Plaintiff, Cortel would not have recommended removing Plaintiff from her employment; and that the evidence relied on by Sgt. Poppert and the ultimate decisionmaker Col. Gilbertson (each appearing to be unbiased) in large part was only as good as what Cortel provided to them. Cortel told Amaral and Okamoto that he would "take care of" the alleged harassment but Plaintiff's complaints continued. Cortel told Amaral that he did not want Plaintiff's complaints to go up the chain of command. Cortel's threat to fire Plaintiff and Waters in response to Plaintiff's announced plan to obtain a TRO almost amounts to direct evidence of retaliatory animus. The undisputed evidence showed that Plaintiff was the only computer operator investigated regarding the missing manual and deleted files and that Cortel initiated this investigation and admitted that he immediately focused on Plaintiff in investigating who took the manual. Cortel also provided the rosters from the white binder to Sgt. Poppert and claimed that no rosters with social security numbers existed even though some clearly did. The jury might reasonably have believed that Cortel attempted to interfere with Sgt. Poppert's investigation by withholding call-back rosters containing Antho-

ny Waters' social security number. Plaintiff willingly provided Sgt. Poppert her version of the manual. Cortel was presumably upset about being named in Plaintiff's July 2001 EEO complaint. Notwithstanding Sgt. Poppert having dropped the missing · manual charge against Plaintiff, Cortel referenced that charge in his September 2001 memorandum recommending termination. Although Col. Gilbertson disciplined Plaintiff with a lesser punishment than that recommended, the evidence was sufficient for the jury to find that Col. Gilbertson "rubber stamped" Cortel's determination of Plaintiff's misconduct, deciding to punish her even though he was new to the job and had not been in his position during the time of the relevant events. Col. Gilbertson only lessened the punishment because he recognized that Plaintiff was a good computer operator and he viewed removal as a harsh punishment (especially for misconduct that he did not have an opportunity to personally observe or address).

Based on the foregoing, the Court concludes that the jury's implicit findings were not against the clear weight of the evidence. Although there was evidence showing that Plaintiff engaged in misconduct, there was sufficient evidence for the jury to have reasonably found that it was plaintiff's engagement in protected activities that was the "but for" cause of her suspension and demotion. Accordingly, Defendant's alternative motion for new trial based on the sufficiency of the evidence is DENIED.

### 2. *Whether Jury Instruction Number 21 Contained a Harmful Error*

 Defendant has argued during the course of this case that Plaintiff's TRO against Laurel Waters cannot, as a matter of law, constitute protected activity, because it was not directed at an unlawful

employment practice by Plaintiff's employer, as required under the "opposition clause" of Section 2000e–3(a). 42 U.S.C. § 2000e–3(a). Defendant also asserts that jury instruction 21 is erroneous because it only requires Plaintiff to prove that she filed the TRO and not whether her obtainment of the TRO constituted protected activity.

Jury instruction number 21, which is based on revised (Approved August 2004) Ninth Circuit Model Instructions, Civil, Instruction 12.3 A, provided:

The Plaintiff seeks damages against the Defendant for retaliation. The Plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

1. the Plaintiff engaged in or was engaging in an activity protected under federal law, that is she complained to upper management about her supervisors failure to remedy alleged religious harassment, that she obtained a TRO against Laurel Waters, and/or that she consulted and filed an Equal Employment Opportunity ("EEO") complaint.

2. the employer subjected the Plaintiff to an adverse employment action, that is Plaintiff was suspended and demoted; and

3. the protected activity was one of the reasons for the adverse employment action and that but for such activity, the Plaintiff would not have been subjected to the adverse employment action.

Defendant cannot be held liable if its decision to suspend and demote Plaintiff was based on non-retaliatory reasons raised by the TRO.

If you find that each of the elements on which the Plaintiff has the burden of proof has been proved, your verdict should be for the Plaintiff. If, on the other hand, the Plaintiff has failed to prove any one of these elements, your verdict should be for the Defendant.

Jury instruction number 20 articulated the conditions under which a plaintiff's "opposition" constitutes "protected activity" under Title VII, including the requirement that Plaintiff oppose her *employer's* unlawful employment practice and that her opposition be reasonable:

In order to be protected activity, the Plaintiff's opposition must have been directed toward a discriminatory act by the Defendant employer. Opposition to a discriminatory act of a co-employee cannot be the basis of a retaliation action. Only reasonable opposition to the employment practice is protected by Title VII; unreasonable, bad faith or malicious complaints are not protected. . . . [9]

The Court held at summary judgment and at trial that the TRO constituted protected activity because by filing the TRO, Plaintiff was opposing her employer's alleged failure to adequately remedy alleged religious harassment as her employer was required to do under Title VII. Contrary to Defendant's assertion, Plaintiff's conduct need not have explicitly referred to discrimination or retaliation in order to constitute protected "opposition activity." *See, e.g., EEOC v. Dinuba Medical Clinic,* 222 F.3d 580, 586 (9th Cir.2000)(holding that Plaintiff's filing of a criminal complaint against her supervisor for assault and battery qualified as a protected "opposition" activity because the Court had made underlying factual findings that the assault was the culmination of a series of discriminatory acts by the supervisor against Plaintiff); *E.E.O.C. v.*

**9.** Jury instruction 20 was proposed by Defendant as Supplemental Instruction No. 3. It is based on the commentary to revised (Approved August 2004) Ninth Circuit Model Jury Instructions, Civil, 12.3 A.

*Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir.1983) (concluding that employees' letter to local school district protesting employer's affirmative action award to an allegedly bigoted coworker constituted protected activity under Title VII); *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir.2001)(concluding that employee's police report alleging sexual contact by her employer constituted opposition to sexual harassment and therefore statutorily protected activity). *See also Porta v. Rollins Environmental Services (NJ), Inc.*, 654 F.Supp. 1275, 1284 (D.N.J.1987) *aff'd without opinion*, 845 F.2d 1014 (3rd Cir.1988)(finding genuine issue of fact as to whether plaintiff's refusal to work the same shift as a supervisor who was allegedly harassing plaintiff constituted statutorily protected opposition to unlawful employment practice, thereby precluding summary judgment on retaliation claim); *Hearn v. R.R. Donnelley & Sons Co.*, 460 F.Supp. 546, 548 (N.D.Ill.1978) (holding that the Title VII prohibition against retaliation "is not confined to situations in which the parties are engaged in formal proceedings, but rather extends to forbid 'discrimination against applicants or employees for attempting to protest or correct allegedly discriminatory conditions of employment'" (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 796, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973))), *quoted in Reginelli v. Motion Indus., Inc.*, 987 F.Supp. 1137, 1139 (E.D.Ark.1997).

Thus, although the TRO does not specifically complain of unremedied religious harassment, its references to Waters' alleged harassment, including several statements that Waters called her crazy, Plaintiff's boss laughing in response to her complaints of harassment, and doing nothing more than asking Plaintiff to report the next incident of harassment. (Exhibit 3B). Moreover, Defendant ignores the fact that Plaintiff filed the TRO only after making repeated complaints of religious harassment to her supervisors and being told by Cortel that he should simply fire both Waters and Plaintiff, which shows that Plaintiff was opposing her supervisors' failure to remedy what she alleged was religious harassment. It is notable that Defendant agreed it was appropriate to include in jury instruction number 21 that Plaintiff's complaints to upper management about her supervisors' failure to remedy religious harassment were a protected activity; yet Defendant argues that when Plaintiff filed a TRO after upper management (such as Cortel and Tanaka) failed to remedy the religious harassment, such conduct does not constitute a protected activity. Accordingly, the Court continues to be unpersuaded by Defendant's assertion that Plaintiff's TRO against Laurel Waters cannot constitute a protected activity and finds that jury instruction number 21 was valid.

 The Court is also unpersuaded by Defendant's argument that jury instruction 21 indicates Plaintiff must only prove she obtained a TRO, not whether her conduct constituted statutorily protected activity. The Special Verdict Form, Count II Question No. 5, asked the jury: "Did Plaintiff prove by a preponderance of the evidence that she was engaged in activity protected by federal law?" Defendant contends that jury instruction 21 made the determination of whether Plaintiff's conduct constituted protected activity a foregone conclusion by only requiring the jury to determine whether or not Plaintiff "engaged" in these activities, specifically in obtaining the TRO.

Defendant expressed this concern outside the presence of the jury when the Court was finalizing jury instructions. The Court agreed with Defendant's concern and the parties approved of the following language to address it:

Defendant cannot be held liable if its decision to suspend and demote Plaintiff was based on non-retaliatory reasons raised by the TRO.

Moreover, the instructions must be looked at as a whole. *See Swinton,* 270 F.3d at 802 ("In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was not fairly and correctly covered.") (internal quotations omitted) (citations omitted). Indeed, jury instruction number 3 instructed the jury that "... you are not to single out any certain sentences or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole and are to regard each in the light of all the others." And in response to a question from the jury, and with the agreement of the parties, the Court explicitly instructed the jury to consider the three instructions that address Defendant's concern here. Specifically, the jury submitted the following question during deliberations: "We need clarification on Count II Question 1" of the special verdict form. The first question relating to Count II (which actually was numbered 5) asked: "Did Plaintiff prove by a preponderance of the evidence that she was engaged in activity protected by federal law?"

With agreement of both parties, the Court responded as follows: "In response to your question, the Court refers you to Jury Instruction Nos. 21, 20, and 19. If you still need clarification after reviewing those instructions, please send the Court a note specifying what is unclear to you." Jury instruction 19 generally articulated the two types of protected activities, jury instruction 20 explained the conditions under which opposition activity will constitute protected activity, including the requirement that the opposition be "reasonable," and jury instruction 21 set forth Plaintiff's 3–element burden in establishing retalia-

tion. The jury did not send any further questions.

Thus, in deciding whether Plaintiff engaged in protected activities, the jury was informed that both Plaintiff's "opposition activity," in complaining to upper management about her more immediate supervisors' (Okamoto, and then Cortel) failure to remedy religious harassment, and in obtaining a TRO, and her "participation" in EEO proceedings could constitute protected activity (jury instruction 19), but that the "opposition" must be reasonable and against unlawful employment practices by her employer (jury instruction 20), and that Defendant could not be found liable for suspending and demoting plaintiff for non-retaliatory reasons raised by the TRO (jury instruction 21). Moreover, jury instruction number 22 articulated the "business judgment rule" by instructing the jury to find in favor of Defendant if they determined that Plaintiff was not suspended and demoted due to her engagement in protected activities, "even if [the jury] believe[d] that Defendant's decision to suspend and demote Plaintiff was unreasonable or erroneous." The Court presumes that the jury in this case followed its instructions. *See Weeks v. Angelone,* 528 U.S. 225, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000) ("A jury is presumed to follow its instructions.").

In conclusion, the Court finds that jury instruction 21 did not contain any error by including the TRO as a protected activity and that Defendant's secondary objection regarding how the TRO is referenced in jury instruction number 21 was satisfied and therefore has been waived by Defendant's agreement to the language added to the instruction by the Court. Defendant did not object to jury instruction number 21 on this basis once the agreed-upon language was added to the instruction. *See* Fed.R.Civ.P. 51; *Kopczynski v. The Jac-*

*queline,* 742 F.2d 555, 560 (9th Cir.1984). Moreover, the modified instruction did not contain any error. Accordingly, the Court DENIES Defendant's alternative motion for a new trial on the basis of an erroneous and harmful jury instruction.

### C. *Conclusion—Motion for New Trial*

For the foregoing reasons, the Court finds that the jury's verdict finding that but for Plaintiff's engagement in protected activities, she would not have been suspended and demoted is *not* against the clear weight of the evidence nor that there is a seriously erroneous result nor a miscarriage of justice. The Court also holds that there was no error, much less a harmful error, in jury instruction number 21. Accordingly, Defendant's alternative motion for a new trial is DENIED.

### CONCLUSION

Viewing the record in the light most favorable to Plaintiff, the prevailing and nonmoving party, the Court finds that Plaintiff produced substantial evidence at trial from which a reasonable jury could infer that but for Plaintiff's engagement in protected activities, she would not have been suspended and demoted. Accordingly, Defendant's motion for judgment as a matter of law must be DENIED. Upon weighing the evidence and assessing the credibility of the witnesses who testified at trial, the Court finds that the jury's verdict was not against the clear weight of the evidence, was not a seriously erroneous result, nor a miscarriage of justice. The Court concludes there was sufficient evidence presented from which the jury could find that "but for" Plaintiff's engagement in protected activities she would not have been retaliated against and subjected to adverse employment actions. Finally, the Court finds that jury instruction number 21 did not contain any errors, much less harmful error. Accordingly, Defendant's

alternative motion for a new trial is DENIED.

The Clerk of this Court is directed to enter judgment for Plaintiff on Count II of her Complaint.

IT IS SO ORDERED.