**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

MARY E. BUCKLEY,
            *Plaintiff-Appellant,*

v.

MICHAEL B. MUKASEY, in his official
capacity as Attorney General of the
United States, Department of
Justice,
            *Defendant-Appellee.*

No. 07-1195

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(1:06-cv-00420-TSE)

Argued: March 18, 2008

Decided: August 20, 2008

Before KING and DUNCAN, Circuit Judges,
and Jane R. ROTH, Senior Circuit Judge of the United States Court
of Appeals for the Third Circuit, sitting by designation.

---

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Duncan and Senior Judge Roth joined.

---

## COUNSEL

**ARGUED:** Paul Reinherz Wolfson, WILMER, CUTLER, PICKER-
ING, HALE & DORR, L.L.P., Washington, D.C., for Appellant.

Kevin Jason Mikolashek, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Danielle Conley, Sarah Adams Zumwalt, WILMER, CUTLER, PICKERING, HALE & DORR, L.L.P., Washington, D.C., for Appellant. Chuck Rosenberg, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

In this action under Title VII of the Civil Rights Act of 1964, Mary Buckley alleged a variety of race discrimination, sex discrimination, and retaliation claims stemming from her employment as a special agent with the Drug Enforcement Administration (the "DEA").[1] During a five-day trial conducted in the Eastern District of Virginia in the fall of 2006, the district court granted judgment as a matter of law to the government on Buckley's failure-to-promote retaliation claim, and the jury found in favor of the government on all remaining claims. Thereafter, Buckley unsuccessfully sought a new trial on three grounds: (1) that the district court improperly restricted the introduction of evidence, relevant to Buckley's theory of retaliatory animus, regarding a separate, ongoing race discrimination action against the DEA in which Buckley was a class member; (2) relatedly, that the court erred in awarding judgment as a matter of law to the government on her failure-to-promote retaliation claim; and (3) that the court wrongly refused to give an adverse inference instruction against the government for spoliation of evidence. Buckley has appealed, and, as explained below, we vacate and remand for further proceedings.

---

[1]This action was brought against Alberto R. Gonzales, in his former capacity as Attorney General of the United States. Gonzales has since been replaced by current Attorney General Michael B. Mukasey. We refer herein to the defendant as the "government."

## I.

## A.

Buckley, an African-American woman, joined the DEA as a special agent in 1974 and has now retired. During her thirty-two-year career as a special agent, she held a variety of positions within the DEA, including undercover, international, and supervisory posts. She also received awards for distinguished service and a series of performance appraisals rating her work for the DEA as excellent.

## 1.

In 1977, a class action — known as the "*Segar* litigation" — was filed in the district court for the District of Columbia, alleging race discrimination by the DEA against African-American special agents, in contravention of Title VII. The *Segar* litigation was brought on behalf of, inter alia, all African-American special agents currently serving with the DEA (including Buckley). Following a bench trial, the *Segar* court determined, in 1981, that the defendants had indeed discriminated against African-American special agents in various ways, including reliance on subjective evaluations by supervisors to award promotions. *See Segar v. Civiletti*, 508 F. Supp. 690 (D.D.C. 1981). Thus, in 1982, the court entered an order enjoining the defendants from discriminating against African-American special agents in promotions and mandating implementation of a nondiscriminatory promotion system. *See Segar v. Smith*, No. 1:77-cv-00081, 1982 WL 214 (D.D.C. Feb. 17, 1982) (the "*Segar* 1982 Order").

Thereafter, in 1992, the DEA implemented a new system for special agent promotions to positions at the GS-14 and -15 grades. The new system relied on an evaluation process called the Special Agent Promotion Process (the "SAPP"). Candidates scoring high on the SAPP were placed on a Best Qualified List (the "BQL"). Then, the upper-level supervisor over the vacancy in question could submit a "Short List" to the DEA's Career Board (comprised of ten senior DEA officials) of the top three candidates from the BQL in order of preference. Finally, the Career Board selected a special agent for the position, usually from the Short List.

In 1997, the plaintiffs in the *Segar* litigation filed a motion for a compliance order, alleging that African-American special agents continued to suffer from race discrimination under the new promotion system. In 1999, the *Segar* court granted the motion for a compliance order in part, enjoining use of the Short List for promotions to GS-14 and -15 positions, pending a showing that its use could be validated as consistent with the DEA's obligations under Title VII. *See Segar v. Reno*, No. 1:77-cv-00081 (D.D.C. Sept. 27, 1999) (the "*Segar* 1999 Order").[2] When nearly 130 managerial positions subsequently went unfilled, the parties entered into a joint stipulation — approved by the court — permitting temporary use of the Short List for promotions to GS-14 and -15 positions, subject to certain terms and conditions. *See Segar v. Reno*, No. 1:77-cv-00081 (D.D.C. Jan. 4, 2000) (the "*Segar* 2000 Interim Order").[3]

2.

In the spring of 2001, Buckley, then a GS-14 special agent assigned to the Office of Inspections in the DEA's Inspection Division, was temporarily promoted to Senior Inspector in the Office of Inspections's Internal Review and Audit Section, a GS-15 position.[4] Buckley's immediate supervisor was Gloria Woods, head of the Office of Inspections, and Woods in turn reported to William Brown, the Acting Chief Inspector (i.e., head of the Inspection Division). In

---

[2]A portion of the *Segar* 1999 Order is found at J.A. 27-32. (Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[3]As of the time the parties filed their appellate briefs herein, the *Segar* 2000 Interim Order was still in effect. The *Segar* 2000 Interim Order is found at J.A. 17-26.

[4]The facts spelled out herein with respect to Buckley's employment with the DEA are largely drawn from the trial record. Where relevant to Buckley's failure-to-promote retaliation claim — on which the government was granted judgment as a matter of law — the facts are recited in the light most favorable to Buckley. *See Int'l Ground Transp., Inc. v. Mayor of Ocean City, Md.*, 475 F.3d 214, 216 n.2 (4th Cir. 2007) ("Because the district court granted judgment as a matter of law, we must view the facts — and we recite them here — in a light most favorable to [the non-moving party].").

her temporary Senior Inspector position, Buckley supervised the section responsible for coordinating reviews of the DEA by the General Accounting Office (the "GAO").

a.

On June 11, 2001, a GAO representative contacted the DEA about conducting a study of the DEA's hiring, promotion, and discipline systems at the request of Congresswoman Eddie Bernice Johnson, a member of the Congressional Black Caucus. Cynthia Ryan, Chief Counsel for the DEA, informed the GAO representative that the systems in question were already the subject of the ongoing and "still very active" *Segar* litigation. J.A. 62. Buckley, Woods, and Brown were forwarded a copy of an email message from Ryan recounting her conversation with the GAO representative, during which the GAO representative expressed, in the words of Ryan, that she intended "to recommend against initiating this GAO investigation," because the "GAO avoids investigating an area which is the subject of current litigation." *Id.* In an ensuing exchange by email, Brown suggested there might be issues that the DEA would need to look into in response to the GAO inquiry. Buckley then responded to Brown, on June 11, 2001, as follows:

> I do think there should be additional information in event the GAO (intended) study has no reflections on the [*Segar*] litigation that [Ryan] mentioned. I think that if it does involve the Congressional Black Caucus, their conclusion will be that DEA is using stalling tactics or have something to hide. In my opinion, GAO's conclusion would have no bearing on any pending litigation.

*Id.* at 61 ("Email 1").

Thereafter, the GAO asked to meet with DEA representatives in order to gather more information for a response to Congresswoman Johnson's request. On June 18, 2001, Buckley sent the following email message to Ryan and Brown:

> As you are probably already aware, GAO has made a 2nd request for a meeting with selected DEA staffers. The pur-

pose of the meeting is to get an understanding of issues sur-
rounding discrimination, hiring, promotions and disciplinary
actions against black agents in DEA. GAO understands
[Ryan's] position. However, GAO isn't familiar with the
whole situation, therefore needs to make a determination as
to how GAO can adequately address Eddie Bernice John-
son's request and, what aspects, if any, that GAO can look
into in order to address [the Congressional Black Caucus]
request.

J.A. 49 ("Email 2"). Email 2 stated that "[p]resent at this meeting will
be," among others, representatives of the *Segar* plaintiffs' steering
committee (the Equal Employment Opportunity Monitoring Commit-
tee, or "EEOMC"), Ryan, and several other specified DEA officials.
*Id.* In addition to Ryan and Brown, Email 2 was sent to Rosalynde
Fenner, head of the EEOMC, and two more EEOMC members. As
such, Ryan viewed Email 2 as an effort by Buckley, acting on her
own accord, to involve the EEOMC in the initial DEA-GAO meeting.[5]

---

[5]DEA Chief Counsel Ryan, testifying in her pretrial deposition, stated
that she deemed it "inappropriate" for Buckley to invite EEOMC repre-
sentatives to the initial DEA-GAO meeting, J.A. 316, and that she was
concerned about a "direct overlap" between the proposed GAO study and
the ongoing *Segar* litigation, including the possibility that documents
would be handed over to the GAO that had not been produced in discov-
ery in the *Segar* litigation, *id.* at 312-13. According to Ryan, she sus-
pected that the *Segar* plaintiffs knew about the impending GAO study
before the DEA did (and perhaps were behind Congresswoman John-
son's request for the study) — a suspicion grounded, in part, on Buck-
ley's ready familiarity with Congresswoman Johnson and the
Congressional Black Caucus. *See id.* at 318-19. Ryan testified that

my concern about this, I think it's become sort of revealed . . .
that they [the *Segar* plaintiffs] have asked for this through the
Congressional Black Caucus, and I could maybe even guess
why.

They were getting maybe a little bit frustrated with the court
not being as fast as they think it should be in resolving some of
their issues.

So fine, . . . but here, my concern with this is now how do I
proceed?

Email 2 closed by stating that "[t]he meeting will take place FRIDAY, June 22, 2001, 9:30 a.m. in IN's conference room on the 4th floor West building. Thanks . . . ." J.A. 49. The Email 2 recipients were notified on June 21, 2001, however, that the June 22 meeting with the GAO had been cancelled. Shortly thereafter, Brown sent an email message to Woods saying that he had "heard from several people that the way this meeting was handled by Mary Buckley and her staff was non-standard and aggravating," in that "[t]he meeting was agreed to and set-up with an outside agency, committing DEA participation at high levels without the courtesy of checking with them to see if the meeting agreed with their respective schedules." *Id.* at 50. Brown criticized Email 2 for constituting "a directive to attend the scheduled meeting rather than a message of coordination regarding a proposed meeting." *Id.* Brown also admonished that "[o]ur job in the Inspection Division is to facilitate contacts with outside agencies so that they can conduct their studies and audits. Our job is not to direct participation or to mandate attendance at such meetings." *Id.*

b.

In July 2001, the DEA posted two GS-15 position openings, "Vacancy 365" (the permanent position in which Buckley was then temporarily serving) and "Vacancy 364." Buckley applied for each of the positions, and was among thirty-three candidates on the BQL for Vacancy 365 and thirty-one candidates on the BQL for Vacancy 364.

---

I've got [Buckley,] a plaintiff class member[,] who is now going to be, seems to be shepherding the GAO request, . . . and she's invited the EEOMC for an entrance visit which is supposed to be with agency, not with plaintiff class representatives.

*Id.* at 319-20. Ryan, who saw the GAO study "as another avenue of discovery" in the *Segar* litigation, suggested that Buckley was acting outside her normal job responsibilities in personally coordinating the study. *Id.* at 321-22. After receiving Email 2, Ryan met with William Simpkins, the DEA's Acting Deputy Administrator, and told him that she "was concerned . . . that we might have this conflict of interest . . . that the EEOMC had been involved, that Mary Buckley had set up this meeting and invited the EEOMC," and also that she "was concerned about . . . the two paths crossing at this point." *Id.* at 328-29.

As Acting Chief Inspector, Brown was responsible for creation of the Short Lists for vacancies in the Inspection Division. Brown tasked Woods with the creation of the Short Lists for Vacancies 365 and 364, and Woods placed Buckley on the Short List for each, ranked first for Vacancy 365 and second for Vacancy 364.[6] Brown later informed Woods, however, that William Simpkins — who had been named Chief Inspector but was then serving as the DEA's Acting Deputy Administrator (and, thus, the Chairman of the Career Board) — wanted Buckley's name removed from the Short Lists. Brown and Woods met with Simpkins, who criticized Buckley's speaking, writing, and interpersonal skills. When Woods became upset by his comments, Simpkins suggested that Woods and Brown discuss the matter between themselves. In the subsequent conversation between Woods and Brown, Woods defended Buckley and asserted that she had done an outstanding job in her temporary post. Brown nevertheless urged Woods to remove Buckley's name from the Short Lists, expressing concern that the vacancies would remain unfilled in view of Simpkins's opposition to Buckley's candidacy. Woods then removed Buckley's name from each of the Short Lists before submitting them to the Simpkins-led Career Board. On August 9, 2001, the Career Board selected from the Short Lists an African-American man for Vacancy 365 and a white man for Vacancy 364.[7]

A few days later, on August 13, 2001, Brown sent a memorandum to Woods, in which he criticized Buckley's performance during a July 9, 2001 interagency briefing presented by the Office of Inspections to, among others, Simpkins and Brown. Brown wrote to Woods that,

---

[6]According to Woods, she believed Buckley to be the most qualified candidate for both positions. She nevertheless listed Buckley second on the Short List for Vacancy 364, because she believed that Buckley would be selected to fill Vacancy 365.

[7]Simpkins's involvement in the creation of the Short Lists for Vacancies 365 and 364 arguably contravened a term and condition of the *Segar* 2000 Interim Order, instructing that each Short List be provided to Career Board members only on the day of the Board's meeting. The government has defended Simpkins's involvement with the Short Lists for Vacancies 365 and 364 as consistent with the *Segar* 2000 Interim Order, in light of the fact that he had been named (though was not yet serving as) Chief Inspector, i.e., the upper-level supervisor over the vacancies in question.

[f]ollowing the briefing[,] we had an opportunity to discuss the briefing with Acting Administrator Simpkins. He expressed his displeasure to you with the briefing and was particularly dissatisfied with the apparent lack of understanding and knowledge exhibited by Acting Senior Inspector Buckley[, as well as another briefer]. After you left Acting Administrator Simpkins' office he directed me to document the shortcomings of the briefings to you in a memorandum.

J.A. 101. Brown acknowledged in the memorandum that Buckley had not expected to serve as a briefer and thus had a limited opportunity to prepare. Nevertheless, Brown also expressed his and Simpkins's criticism of Buckley, who was responsible for the program at issue in the briefing, for "deferr[ing] repeatedly to subordinates when attempting to answer questions" and for "g[iving] the impression that she was not familiar with the subject matter." *Id.* at 102.

That same day, August 13, 2001, Buckley sent an email message to Fenner, head of the EEOMC, memorializing a discussion between Buckley and Simpkins about why Buckley was denied a promotion. According to Buckley, Simpkins "stated a lot of things," including that Buckley "was not the best of the best qualified." J.A. 103. Simpkins specifically cited Buckley's handling, via Email 2, of the scheduling of the DEA-GAO meeting, as well as her performance during the recent interagency briefing. In Buckley's view, "[t]he bottom line [was that Simpkins] was upset about the GAO report that Cindy Ryan complained about," i.e., the GAO's impending study of the DEA's hiring, promotion, and discipline systems. *Id.*

3.

On August 28, 2001, Buckley consulted with a DEA equal employment opportunity ("EEO") counselor about the DEA's failure to promote her. On August 31, 2001, Buckley was among several GS-14 and -15 special agents notified that they were subject to being transferred from DEA headquarters in northern Virginia to a field office, as part of a regular agency transfer process. On October 4, 2001, Buckley filed an internal EEO complaint with the Department of Justice, alleging that her removal from the Short Lists for Vacancies 365

and 364, as well as the threatened transfer from DEA headquarters to a field office, were based on her race and sex and were retaliatory. On February 14, 2002, Brown downgraded Buckley's annual performance rating from "Outstanding" to "Acceptable." On April 4, 2002, Buckley was permitted to amend her EEO complaint to contest the downgrading of her appraisal. In May 2002, the Career Board (with Simpkins abstaining) voted to transfer Buckley to the Miami field office.[8]

B.

On May 25, 2004, after exhausting her administrative remedies and being issued a right-to-sue letter, Buckley initiated this action in the District of Columbia. On March 17, 2005, she filed in that court an Amended Complaint alleging that the government contravened Title VII by removing her from the Short Lists for Vacancies 365 and 364 (the "failure to promote"); transferring her to the Miami field office (the "geographic reassignment"); and downgrading her February 2002 performance appraisal (the "negative review"). Buckley asserted that each of these actions was racially and sexually discriminatory, as well as retaliatory. On March 21, 2006, the District of Columbia court transferred Buckley's Title VII claims to the Eastern District of Virginia on venue grounds. *See Buckley v. Gonzales*, No. 1:04-cv-00841 (D.D.C. Mar. 21, 2006) (the "*Buckley* Transfer Order").[9]

---

[8]In June 2003, the GAO issued a report to Congresswoman Johnson on its study of the hiring, promotion, and discipline systems at the DEA. *See* J.A. 151. Among the GAO's findings were that, during fiscal years 1997 through 2001, "African American and Hispanic special agents were recommended for promotion at significantly lower rates," but that, "[d]espite differences in recommendation rates, DEA's promotion decisions mirrored the race, ethnic, and gender makeup of the agency's special agent workforce." *Id.* at 152.

[9]In her Amended Complaint, Buckley had also asserted three civil contempt claims on the theory that, by way of the conduct involved in her Title VII claims, the government violated the *Segar* 1982 Order and the *Segar* 2000 Interim Order. By the *Buckley* Transfer Order, the District of Columbia court dismissed the civil contempt claims without prejudice, explaining that they needed to be raised in the *Segar* litigation itself. The *Buckley* Transfer Order is found at J.A. 241-44.

1.

Buckley's trial in the Virginia district court commenced on October 30, 2006.[10] During preliminary proceedings, the district court sought to clarify the theories underlying Buckley's Title VII retaliation claims.[11] The court concluded that Buckley could proceed on the

---

[10]Prior to trial, on October 20, 2006, the district court awarded summary judgment to the government on Buckley's failure-to-promote race claim, insofar as Buckley was excluded from consideration for Vacancy 365, because another African-American candidate was selected for that position. Buckley does not contest such summary judgment award in this appeal. By the time of trial, Buckley's geographic-reassignment and negative-review race and sex claims were also apparently out of the case.

[11]The district court accepted — as do we (with the government's acquiescence) — that a federal employee, like Buckley, may pursue a retaliation claim under Title VII. *See Baqir v. Principi*, 434 F.3d 733, 747 n.16 (4th Cir. 2006) (assuming that federal employee's retaliation claim was cognizable, but recognizing that relevant Title VII provision, 42 U.S.C. § 2000e-16, does not explicitly provide for such cause of action); *see also Gomez-Perez v. Potter*, 128 S. Ct. 1931, 1941 n.4 (2008) (acknowledging, but declining to decide, open question of "whether Title VII bans retaliation in federal employment"). In assessing the theories underlying Buckley's retaliation claims, the district court looked to the Title VII provision prohibiting private-sector retaliation, 42 U.S.C. § 2000e-3(a). That provision recognizes two categories of protected activity: (1) "opposition," i.e., "oppos[ing] any practice made an unlawful employment practice"; and (2) "participation," i.e., "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing." § 2000e-3(a). The district court required Buckley to show, in order to establish a prima facie case of retaliation, that she engaged in a protected activity, that the government took a materially adverse action against her, and that a causal relationship existed between her protected activity and the government's action. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 & n.2 (4th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (holding that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, [meaning] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks omitted))). The government took issue below with the district court's approach to Buckley's retaliation claims, but does not challenge it in this appeal.

premise that the government retaliated against her for having engaged in protected "participation" activities, with relation to both her 2001 internal EEO complaint and her involvement in the *Segar* litigation. Nevertheless, the court only reluctantly accepted Buckley's *Segar* litigation theory: that the government's retaliatory animus — especially with regard to the failure to promote — was prompted by Buckley's active participation in the ongoing *Segar* litigation (as compared to passive membership in the plaintiff class), including her self-directed effort, via Email 2, to include the EEOMC in the initial DEA-GAO meeting. For support of this theory, Buckley pointed to the pretrial deposition testimony of DEA Chief Counsel Ryan, revealing that she had shared her concerns about Buckley's Email 2-related conduct with Acting Deputy Administrator Simpkins, a key decisionmaker with respect to Buckley's subsequent nonpromotion. *See supra* note 5. The district court permitted Buckley to attempt to demonstrate that Simpkins or another decisionmaker knew of (and was motivated by) her active participation in the *Segar* litigation, though the court expressed doubt that Buckley could demonstrate such a causal relationship between her protected activity and nonpromotion.[12]

Despite the district court's belief that Buckley faced difficulties in proving the *Segar* litigation theory of retaliatory animus, the court limited the evidence that could be presented to the jury with respect to the *Segar* litigation, invoking several provisions of the Federal Rules of Evidence. The court — having characterized the *Segar* litigation as "ancient history" by the summer of 2001, when the events complained of began, J.A. 398 — admonished Buckley not to name the *Segar* litigation or describe its history, including any past findings of discrimination. Rather, the court merely gave allowances that "you may ask and you may say to the jury that you intend to show that the retaliatory conduct was based, in part, on her being active in . . . ongoing litigation against the DEA for race . . . discrimination, and we'll deal with it in the [Federal Rule of Civil Procedure] 50 stage." *Id.* at 405. The court also permitted evidence on the requirements of the DEA's GS-14 and -15 promotion system and its purpose of ensur-

---

[12]Buckley had also contended during the preliminary proceedings that her statements in Email 1 constituted protected "opposition" activity. Although the district court expressed skepticism about this theory, the court allowed Buckley to proceed on it.

ing equal opportunity, but barred mention that the promotion system was governed by the *Segar* 2000 Interim Order.

Finally during the preliminary proceedings, the district court denied Buckley's request for an adverse inference instruction against the government for spoliation of evidence. Buckley's request was based on the DEA's destruction of electronic documents (including email messages), pursuant to routine internal procedures, from the time the government could reasonably anticipate this litigation until nearly two weeks *after* its discovery responses to Buckley were due. In refusing the adverse inference instruction, the court ruled that Buckley had failed to make a requisite showing of "willful conduct," rather than mere negligence. J.A. 407. The court also suggested that it was proper for the DEA to "continue[ ] its routine document recycling protocols" since "[n]o order was entered to the contrary," *id.*, and cited Buckley for her own "negligence or inattention" in failing to obtain such an order, *id.* at 408. Additionally, the court indicated that an adverse inference instruction would be improper for the reason that Buckley failed to identify "any specific document or set of documents which someone says would typically have said something that the plaintiff[ ] now say[s she] should have an inference that it did say that." *Id.* at 408-09. The court concluded that "[s]imply an adverse inference that these documents would reflect adversely on defendant's case . . . paints with too broad a brush. So I'm going to deny the request for an adverse inference" instruction. *Id.* at 409.

2.

Following the preliminary trial proceedings, during Buckley's case-in-chief, DEA Chief Counsel Ryan was called as a witness and questioned within the limitations set forth by the district court. Ryan testified about her concerns over Buckley's conflicting roles as the DEA liaison for the GAO study and as a plaintiff class member in the *Segar* litigation (referred to in front of the jury as, e.g., "some active litigation"). *See* J.A. 488-501. Ryan's testimony was similar to that given during her pretrial deposition. For example, Ryan again testified at trial about sharing her concerns with Acting Deputy Administrator Simpkins. As compared to her deposition testimony, however, Ryan's trial testimony was appreciably circumscribed — apparently as a result of the district court's limitations on discussion of the *Segar*

litigation. During the government's presentation, neither Simpkins nor Acting Chief Inspector Brown testified to having any knowledge during the relevant time period that Buckley was actively involved in the *Segar* litigation.

Before the case was submitted to the jury, the government made a motion, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law. The district court granted the government's Rule 50 motion with respect to Buckley's failure-to-promote retaliation claim. The court premised its ruling on, inter alia, the lack of a legally sufficient evidentiary basis to find that the relevant decisionmakers (Simpkins and Brown) knew that Buckley was an active participant in the *Segar* litigation, rather than simply a passive member of the plaintiff class. The court rejected Buckley's reliance on Ryan's testimony to establish Simpkins's knowledge, characterizing that testimony as "too slender a reed to permit the jury to speculate on whether Mr. Simpkins . . . knew that [Buckley] was . . . more than a member of the class." J.A. 605.[13]

Thereafter, on November 3, 2006, the remaining claims — for failure to promote based on race (Vacancy 364 only) and sex (Vacancies 365 and 364), and for retaliatory negative review — were submitted to the jury. Later that same day, the jury returned a verdict in the gov-

---

[13]In granting the government's Rule 50 motion on Buckley's failure-to-promote retaliation claim, the district court also rejected the theory that Email 1 constituted protected opposition activity. *See supra* note 12. The court further rejected an assertion by Buckley that the government had contravened the *Segar* 2000 Interim Order, by way of Acting Deputy Administrator Simpkins's involvement in the creation of the Short Lists for Vacancies 365 and 364 despite his membership on the Career Board, and that this violation was itself proof of retaliation. *See supra* note 7. Additionally, the court awarded Rule 50 judgment to the government on Buckley's geographic-reassignment retaliation claim, on the ground that, inter alia, Buckley failed to demonstrate that her transfer to the Miami field office constituted a materially adverse action. *See supra* note 11. Notably, however, the court accepted that the failure to promote (i.e., the removal of Buckley from the Short Lists for Vacancies 365 and 364) and the negative review (i.e., the downgrading of Buckley's 2002 performance appraisal) could be deemed as materially adverse actions. The parties do not contest any of those rulings herein.

ernment's favor, and the district court entered judgment against Buckley.

3.

On November 20, 2006, Buckley filed a motion for a new trial, pursuant to Federal Rule of Civil Procedure 59. She contended, inter alia, that the district court had erred in limiting discussion at trial of the *Segar* litigation, in granting Rule 50 judgment as a matter of law on her failure-to-promote retaliation claim, and in refusing to give an adverse inference instruction against the government for spoliation of evidence. By order of December 28, 2006, the court denied Buckley's Rule 59 new trial motion. *See Buckley v. Gonzales*, No. 1:06-cv-00420 (E.D. Va. Dec. 28, 2006) (the "*Buckley* Post-trial Order").[14] The court explained therein that it had properly limited discussion of the *Segar* litigation at trial, because further information on the litigation was inadmissible under the Federal Rules of Evidence. *See id.* at 6-8. Next, the court concluded that it had appropriately granted the government's Rule 50 motion on Buckley's failure-to-promote retaliation claim, in that she "failed to produce any evidence that Ryan's concerns [over Buckley's conflicting roles as the DEA liaison for the GAO study and as a plaintiff class member in the *Segar* litigation] were communicated to the actual decisionmakers," and, thus, "there was no evidence in the record to allow a reasonable jury to find the requisite causal connection" between Buckley's active participation in the *Segar* litigation and her nonpromotion. *Id.* at 8. Finally, the court reiterated its earlier ruling that Buckley was not entitled to an adverse inference instruction against the government for spoliation of evidence, because she failed to show that the "destruction of documents was a result of intentional conduct." *Id.* at 9 (internal quotation marks omitted).

Buckley timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[14]The *Buckley* Post-trial Order is found at J.A. 612-20.

## II.

In this appeal, Buckley contends that the district court erred in denying her a new trial on the three grounds discussed above: (1) the restriction of trial evidence with respect to the *Segar* litigation; (2) the award of judgment as a matter of law to the government on her failure-to-promote retaliation claim; and (3) the denial of her request for an adverse inference instruction against the government for spoliation of evidence. We review the court's denial of Buckley's new trial motion, made pursuant to Federal Rule of Civil Procedure 59, for abuse of discretion. *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). On Buckley's Rule 59 motion, the court should have granted a new trial only if "the verdict is against the clear weight of the evidence," or "is based on evidence which is false," or (as Buckley asserts with respect to the verdict in her trial) "will result in a miscarriage of justice." *Id.* (internal quotation marks omitted). We assess each of Buckley's asserted grounds for a new trial in turn.

## A.

First, Buckley maintains that the district court improperly limited the trial evidence with respect to the details of the *Segar* litigation. We review the court's decision to exclude such evidence for abuse of discretion. *See Schultz v. Capital Int'l Sec., Inc.*, 460 F.3d 595, 606 (4th Cir. 2006). By definition, the court abused its discretion if it made an error of law. *See RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 356 (4th Cir. 2007). The court's evidentiary ruling, however, even if it constitutes an abuse of discretion, "is reversible only if it affects [Buckley's] substantial rights." *Schultz*, 460 F.3d at 606-07 (citing Fed. R. Evid. 103(a)).

As the district court explained during the preliminary trial proceedings and in the *Buckley* Post-trial Order, it limited discussion of the *Segar* litigation under multiple provisions of the Federal Rules of Evidence: Rule 401 (defining "'[r]elevant evidence' [as] evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Rule 402 (providing that "[e]vidence which is not relevant is not admissible"); Rule 404(a)

(generally prohibiting the admission of character evidence "for the purpose of proving action in conformity therewith on a particular occasion"); Rule 404(b) (providing that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith[, but] may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"); and Rule 403 (allowing that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by[, inter alia,] the danger of unfair prejudice, confusion of the issues, or misleading the jury").

During the preliminary trial proceedings, the district court observed that Buckley sought to introduce evidence regarding the *Segar* litigation in order to establish "an environment of discrimination" within the DEA. J.A. 396. The court characterized this justification for admitting the evidence as "nothing but . . . another way of saying propensity. These people discriminated before, . . . they are discriminating now." *Id.* The court deemed such propensity evidence inadmissible, invoking Rules 402, 403, and 404(a). By the *Buckley* Post-trial Order, the court further observed that the *Segar* litigation evidence was properly limited under Rules 401 and 402, explaining that

> the *Segar* litigation, which began in 1982, involved different decisionmakers whose racial animus cannot be attributed to the decisionmakers here. Thus, the facts or circumstances underlying *Segar* are not relevant to the employment actions taken by [this defendant] against plaintiff.

*Buckley* Post-trial Order 6. Similarly, the court observed that, because Buckley sought "to introduce the prior bad acts of *other* decisionmakers to show defendant's state of mind, the evidence is inadmissible under Rule 404(b)." *Id.* at 7. Finally, with respect to the Rule 403 aspect of its ruling, the court determined that, "even assuming the *Segar* litigation was relevant to the defendant's state of mind in this case, . . . the potential unfair prejudice and confusion of the issues is manifest, and substantially outweighs any probative value" of the *Segar* litigation evidence. *Id.*

Apparently, the district court misunderstood the purpose for which Buckley sought the admission of the *Segar* litigation evidence. Buckley did not, as the court believed, seek to use such evidence to establish either a general propensity to discriminate against African-American employees within the DEA, or a more specific racially discriminatory animus on the part of the decisionmakers in her case based on past discriminatory acts committed by other DEA decisionmakers. Rather, Buckley intended to utilize the *Segar* litigation evidence to demonstrate *retaliatory* animus, as she was required to do to prevail on her retaliation claims. Specifically, Buckley sought to show "that the pendency of *Segar* and the long history of its burden on DEA weighed heavily on the minds of the principal decision-makers, and that, ultimately, those decision-makers failed to promote Buckley because of her involvement in the litigation." Br. of Appellant 19.

Buckley's *Segar* litigation theory — that the government's retaliatory animus was prompted by, inter alia, her Email 2 invitation to the EEOMC to attend the initial DEA-GAO meeting — was essential to her failure-to-promote retaliation claim, and also relevant to her negative-review retaliation claim (though that claim could also rely on the theory that the government's animus stemmed from Buckley's post-nonpromotion internal EEO complaint). Nevertheless, under the district court's ruling on the *Segar* litigation evidence, Buckley was barred from presenting evidence, for example, of the *Segar* plaintiffs' various successes against the DEA, from the initial findings of race discrimination to the series of injunctions controlling DEA operations, including the *Segar* 2000 Interim Order governing the very promotions at issue in this case. Although Buckley was permitted to introduce evidence on the requirements of the DEA's promotion system and its purpose of ensuring equal opportunity, she was prohibited from mentioning to the jury that the promotion system was governed by the *Segar* 2000 Interim Order or in any way connected to the nebulous "ongoing litigation" against the DEA in which she was involved. These restrictions on the *Segar* litigation evidence foreclosed a coherent and compelling evidentiary account of the government's alleged retaliation. By "prohibit[ing] Buckley from introducing evidence of the *Segar* [l]itigation in all but the most sanitized terms," Br. of Appellant 17, the court prevented Buckley from demonstrating why her participation in that litigation so rankled the relevant DEA decisionmakers that they were provoked to retaliate against her.

We are constrained to conclude that the district court's ruling on the *Segar* litigation evidence constituted an error of law and, thus, an abuse of discretion. As Buckley contends, retaliation claims like hers, which are

> based on retaliation for pursuing discrimination claims in the past[,] are inextricably linked to past acts of discrimination. Because such evidence of prior bad acts speaks directly to the defendant's motive or intent to retaliate, such evidence must be admitted if the plaintiff is to have any real chance of proving her retaliation claim.

Br. of Appellant 17; *see also, e.g.*, *Funai v. Brownlee*, 369 F. Supp. 2d 1222 (D. Haw. 2004) (observing that retaliation plaintiff presented trial evidence supporting theory that employer developed retaliatory animus after she obtained temporary restraining order in separate court proceeding against co-worker for religious harassment); *Fernandez v. N. Shore Orthopedic Surgery & Sports Med., P.C.*, 79 F. Supp. 2d 197 (E.D.N.Y. 2000) (noting that retaliation plaintiff testified at trial about being discharged shortly after entering conciliation agreement with employer on prior administrative charge of national origin discrimination).

Viewed in the light of its real purpose of establishing retaliatory animus, the *Segar* litigation evidence is unquestionably "'[r]elevant'" within the meaning of Rule 401. Moreover, such evidence of other wrongs or acts is admissible under Rule 404(b), "which allows evidence of other wrongs for purposes such as proof of motive and intent." *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992) (en banc) (approving trial court's admission under Rule 404(b) of prior consent order prohibiting defendant's further race discrimination against patrons, because evidence that defendant failed to comply with terms of consent order was probative of motive and intent issues in plaintiff's civil rights case); *see also Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988) (relying on Rules 401 and 404(b) for proposition that "[t]he use of racially offensive language by the decisionmaker is relevant as to whether racial

animus was behind the membership decision, and was proper evidence for the jury to consider").[15]

Although Rule 404(b) evidence is subject to the balancing analysis of Rule 403, "the potential importance of evidence showing state of mind is properly weighed in the balance." *Mullen*, 853 F.2d at 1133. Clearly, the critical importance of the *Segar* litigation evidence to Buckley's proof of retaliatory animus is not outweighed (much less substantially outweighed) by any danger of unfair prejudice. *Cf. id.* at 1135 (rejecting Rule 403 unfair prejudice contention with respect to evidence of racial epithets on ground, inter alia, that "[t]he epithets involved here are offensive precisely because they convey the idea of racial bigotry," and "[t]he emotional reaction claimed to be unfairly prejudicial is thus closely tied to the [requisite] inquiry into state of mind"). To the extent there is any danger of confusion of the issues, a limiting instruction could be utilized to caution the jury that the *Segar* litigation evidence is to be considered only as evidence of retaliatory animus. *Cf. Johnson*, 974 F.2d at 1413 (approving "the district court's efforts to minimize any prejudicial effect on the defendants by way of instructions to the jury"); *Mullen*, 853 F.2d at 1134 (observing that "[t]he district court might have issued a cautionary instruction to the effect that the racial statements were only to be considered on the

---

[15]Notably, several of our sister courts of appeals have deemed evidence of prior retaliatory acts against others as admissible under Rule 404(b) to prove the plaintiffs' own retaliation claims. *See, e.g., Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008) (concluding, where plaintiff alleged that employer retaliated against him for filing race discrimination charge, that co-workers' "'me too' evidence" was admissible as "probative of the intent of Bagby Elevator to retaliate against any black employee who complained about racial slurs in the workplace"); *Hitt v. Connell*, 301 F.3d 240, 249-50 (5th Cir. 2002) (where plaintiff alleged retaliation for union participation, ruling that co-workers were properly "allowed to testify that they were discharged or otherwise discriminated against because of their participation in the union," because such evidence was admissible as proof of motive); *Morris v. Wash. Metro. Area Transit Auth.*, 702 F.2d 1037, 1046 (D.C. Cir. 1983) (where plaintiff asserted First Amendment retaliation claim, deeming admissible, as probative of motive, "evidence showing that the employer followed a broad practice of retaliation and responded to any protected criticism with disciplinary action").

question of discriminatory intent in Mullen's particular case, but the outright exclusion of the evidence was improper"). Accordingly, the district court erred as a matter of law in relying on the Federal Rules of Evidence to limit the *Segar* litigation evidence as it did.

Furthermore, the trial court's error in restricting the *Segar* litigation evidence affected Buckley's substantial rights by rendering her unable to cogently demonstrate *Segar* litigation-related retaliatory animus. *See Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (en banc) (recognizing that evidentiary errors do not affect substantial rights, and thus are harmless, if reviewing court is "able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors'" (quoting, inter alia, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (some internal quotation marks omitted) (alteration in original)); *see also Bank of Montreal v. Signet Bank*, 193 F.3d 818, 834 (4th Cir. 1999) (concluding that trial court committed reversible error under *Kotteakos* by excluding evidence of contract terms necessary to fraud claim defense, in that "[g]iven the great importance of the [contract] to the proper development and evaluation of material elements of the cause of action, it was not harmless to exclude that evidence"). Moreover, we cannot say that the district court's evidentiary error did not permeate the trial, negatively affecting the presentation of Buckley's race and sex discrimination claims, as well as her retaliation claims. We therefore conclude that Buckley is entitled to a new trial on the claims that were, and which should have been, submitted to the jury in the 2006 trial. *See Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 290 (4th Cir. 2000) ("A partial new trial may be granted . . . only if 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" (quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931))).[16]

---

[16]In granting a new trial on Buckley's race and sex discrimination claims, we do not mean to say that the court erred insofar as it ruled that the *Segar* litigation evidence is inadmissible to prove *discriminatory* animus on the parts of the relevant decisonmakers. Buckley has acknowledged that she cannot rely on the *Segar* litigation evidence for proof of her race and sex discrimination claims, and that an appropriate limiting instruction may be in order for her retrial.

B.

Next, Buckley asserts that the district court erred in awarding judgment as a matter of law to the government, pursuant to Federal Rule of Civil Procedure 50, on her failure-to-promote retaliation claim. We review de novo the court's grant of the government's Rule 50 motion, viewing the evidence in the light most favorable to Buckley, the non-moving party, and drawing all reasonable inferences in her favor. *See A Helping Hand, LLC v. Balt. County, Md.*, 515 F.3d 356, 365 (4th Cir. 2008); *see also Int'l Ground Transp., Inc. v. Mayor of Ocean City, Md.*, 475 F.3d 214, 216 n.2 (4th Cir. 2007). "We must affirm if a reasonable jury could only rule in favor of the [government]; if reasonable minds could differ, we must reverse." *A Helping Hand*, 515 F.3d at 365.

At trial, the district court awarded judgment as a matter of law to the government on the failure-to-promote retaliation claim on the ground that the evidence relied on by Buckley to demonstrate retaliatory animus — i.e., the testimony of DEA Chief Counsel Ryan that she shared her concerns over Buckley's Email 2-related conduct with Acting Deputy Administrator Simpkins — was "too slender a reed to permit the jury to speculate on whether Mr. Simpkins[, a key decisionmaker with respect to Buckley's subsequent nonpromotion,] knew that she was . . . more than" a passive plaintiff class member in the *Segar* litigation. J.A. 605. Thereafter, in the *Buckley* Post-trial Order, the court stood by its ruling, explaining that Buckley "failed to produce any evidence that Ryan's concerns were communicated to the actual decisionmakers [Simpkins and Acting Chief Inspector Brown]," and, thus, that "there was no evidence in the record to allow a reasonable jury to find the requisite causal connection" between Buckley's active participation in the *Segar* litigation and her nonpromotion. *Buckley* Post-trial Order 8.

We find the proposition that Ryan's testimony was insufficient to establish Simpkins's knowledge to be dubious at best. Nevertheless, we also recognize that, to the extent Ryan's testimony and other trial evidence failed to adequately support Buckley's failure-to-promote retaliation claim, it was seemingly because of the district court's improper restriction on the *Segar* litigation evidence, as discussed *supra*. Accordingly, we conclude that the court erred in granting the

government's Rule 50 motion on the failure-to-promote retaliation claim, and thus reinstate that claim to be retried with the claims submitted to the jury in the 2006 trial.[17]

### C.

Finally, Buckley contends that the district court wrongly refused her request for an adverse inference instruction against the government for spoliation of evidence. We review the court's jury instructions for abuse of discretion. *See A Helping Hand*, 515 F.3d at 370. Of course, "[a]n error of law constitutes an abuse of discretion." *Id.*; *see also RZS Holdings*, 506 F.3d at 356. The "judgment will be reversed for error in jury instructions," however, "only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Abraham v. County of Greenville, S.C.*, 237 F.3d 386, 393 (4th Cir. 2001) (internal quotation marks omitted).

Buckley sought an adverse inference instruction against the government for spoliation of evidence, i.e., the DEA's destruction of electronic documents, pursuant to routine internal procedures, from the time the government could reasonably anticipate this litigation until nearly two weeks after its discovery responses to Buckley were due. The primary ground for the district court's denial of Buckley's request — reflected in the court's ruling during the preliminary trial proceedings, as well as in the *Buckley* Post-trial Order — was that Buckley failed to demonstrate willful or intentional conduct, rather than mere negligence, on the part of the government. In so ruling, the court relied on, inter alia, the following statement from our decision in *Vodusek v. Bayliner Marine Corp.*:

---

[17]We observe that the parties have engaged in some debate over whether it is necessary for Buckley to prove "active" participation in the *Segar* litigation, or whether her simple membership in the plaintiff class is enough. *Cf. Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 211 F. App'x 373, 376 (6th Cir. 2006) (recognizing that, in order to demonstrate protected *opposition* activity, plaintiff must show "active, consistent 'Opposing' activities" (internal quotation marks omitted)), *cert. granted*, 128 S. Ct. 1118 (2008). This issue is moot, however, because Buckley actually relies on a theory of active participation in support of her failure-to-promote retaliation claim.

> An adverse inference about a party's consciousness of the weakness of his case . . . cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.

71 F.3d 148, 156 (4th Cir. 1995).

The *Vodusek* plaintiff had alleged negligence, products liability, and wrongful death claims following the death of her husband from injuries sustained in a boat explosion and fire. *See* 71 F.3d at 151. "In examining the boat to discover the cause of the explosion and fire, [Vodusek's expert witness], together with Vodusek's two sons, employed destructive methods which rendered many portions of the boat useless for examination by the defendants and their experts." *Id.* at 155. At the defendants' request, the trial court then instructed the jury that it was permitted to "assume that evidence made unavailable to the defendants by acts of plaintiff's counsel or agents . . . would have been unfavorable to the plaintiff's theory in the case." *Id.* (internal quotation marks omitted). On appeal, Vodusek contended that the court erred in instructing the jury on the spoliation issue, because there was no evidence on the "necessary element" of bad faith. *Id.* In our opinion, however, "[w]e reject[ed] the argument that bad faith is an essential element of the spoliation rule." *Id.* at 156. Rather, we concluded that

> when a proponent's intentional [but not necessarily bad faith] conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct. [The court may, inter alia,] permit the jury to draw unfavorable inferences against the party responsible for the loss or destruction of the original evidence. An adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evi-

dence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.

*Id.* (internal citations omitted). Applying this standard in *Vodusek*, we determined that, because portions of the boat "were permanently destroyed as part of [the plaintiff's expert's] deliberate investigative efforts" — even if Vodusek and her expert "did not act in bad faith" — the trial court had properly submitted the spoliation issue to the jury. *Id.* at 156-57.

In its analysis of Buckley's request for an adverse inference instruction, the district court appears to have committed an error of law by equating the intentional conduct necessary for such an instruction with bad faith, thereby deeming non-bad faith conduct to be negligent conduct. The court did not acknowledge that the DEA's document destruction, though not conducted in bad faith, could yet be "intentional," "willful," or "deliberate." *See Vodusek*, 71 F.3d at 156. Nevertheless, because we already are remanding for a new trial on other grounds, we simply leave it to the district court to consider on remand — consistent with our discussion herein — Buckley's request for an adverse inference instruction. In the circumstances, we do not unnecessarily engage in our own assessment of whether an adverse inference instruction is warranted, or whether Buckley was prejudiced by the court's prior refusal to give such an instruction.

We note, however, that the district court raised two possible alternative grounds for its ruling during the preliminary trial proceedings — the failure of Buckley to secure a court order prohibiting the DEA's destruction of documents, and the lack of specificity in her request for the adverse inference instruction. Because the issue of whether Buckley was obliged to obtain a court order to ensure DEA document preservation is likely to resurface, we simply observe that (even absent a court order) "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). By contrast, we need not comment on the issue of whether Buckley's initial instruction request lacked sufficient specificity. Rather, the district court may — if the

opportunity arises — take a fresh look at this and other relevant issues on remand.

## III.

Pursuant to the foregoing, we vacate the district court's judgment in favor of the government, and remand for such further proceedings as may be appropriate on Buckley's failure-to-promote retaliation claim and the claims submitted to the jury in the 2006 trial.

*VACATED AND REMANDED*